UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEVIN CHMIELEWSKI,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, *et al*.,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 20-3025 (CJN)

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# Table of Contents

Introduction..................................................................................................................... 1

Background ...................................................................................................................... 3

Legal Standard ............................................................................................................... 5

Argument ........................................................................................................................ 6

    I.      Plaintiff Fails to State a Claim for a Due Process Violation Because He Lacks Any Property Interest in His At-Will Political Appointment. ................................ 7

    II.    Plaintiff Has Failed To State a Due Process Claim for the Termination of His Health Insurance. ................................................................................................... 9

    III.   Plaintiff's Complaint Fails to Allege Operative Facts Showing First Amendment Retaliation by either Agency. ............................................................................ 10

          A.    Applicable Public-Employment Framework for Plaintiff's First Amendment Claim .................................................................................... 10

          B.    Plaintiff Fails to State a First Amendment Claim Against EPA: He Spoke Not as a Citizen, but as an Employee Pursuant to his Official Duties, and Lacked First Amendment Protection as a Policy-Level Employee. ......... 14

          C.    Plaintiff's Complaint Fails to State a First Amendment Claim Against DOE because the *Pickering* Balancing Test Weighs in DOE's Favor. .... 21

    IV.   The Core Relief Plaintiff Seeks—an Order Requiring His Appointment to a Government Position—Is Legally Unavailable Under these Facts. .................... 23

CONCLUSION.............................................................................................................. 28

# Table of Authorities

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ......................................................................................... 5, 6

*Baumann v. District of Columbia,*
  795 F.3d 209 (D.C. Cir. 2015) .................................................................... 10, 11

*Bd. of Regents v. Roth,*
  408 U.S. 564, (1972) ........................................................................................ 7, 9

*Brancaccio v. Reno,*
  964 F. Supp. 1 (D.D.C. 1997) ............................................................................. 10

*Branti v. Finkel,*
  445 U.S. 507 (1980) ...................................................................................... 12, 25

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) ............................................................................................. 7

*Connick v. Myers,*
  461 U.S. 138 (1983) ...................................................................................... 12, 23

*Davis v. Billington,*
  51 F. Supp. 3d 97 (D.D.C. 2014) ....................................................................... 23

*Davis v. McKinney,*
  518 F.3d 304 (5th Cir. 2008) ............................................................................. 14

*Elrod v. Burns,*
  427 U.S. 347 (1976) .............................................................................. 12, 13, 25

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) .............................................................................. 2, 11, 14

*Graham v. Ashcroft,*
  358 F.3d 931 (D.C. Cir. 2004) ............................................................................. 9

*Grossart v. Dinaso,*
  758 F.2d 1221 (7th Cir. 1985) ........................................................................... 13

*Hall v. Ford,*
  856 F.2d 255 (D.C. Cir. 1988) ..................................... 7, 8, 12, 13, 19, 20, 21, 23

*Harris v. D.C. Water & Sewer Auth.*,
    195 F. Supp. 3d 100 (D.D.C. 2016) ........................................ 8

*Hubbard v. Adm'r, E.P.A.*,
    982 F.2d 531 (D.C. Cir. 1992) ........................................ 23

*Hubbard v. EPA*,
    809 F.2d 1 (D.C. Cir.1986) ........................................ 25

*Jimenez Fuentes v. Torres Gaztambide*,
    807 F.2d 236 (1st Cir. 1986) (en banc) ........................................ 13

*Lamb v. Holder*,
    82 F. Supp. 3d 416 (D.D.C. 2015) ........................................ 9

*Lane v. Franks*,
    573 U.S. 228 (2014) ........................................ 10, 16

*Lawrence v. Acree*,
    665 F.2d 1319 (D.C. Cir. 1981) ........................................ 8

*LeFande v. District of Columbia*,
    841 F.3d 485 (D.C. Cir. 2016) ........................................ 12

*McGregor v. Greer*,
    748 F. Supp. 881 (D.D.C. 1990) ........................................ 27

*Morrison v. Olson*,
    487 U.S. 654–76 (1988) ........................................ 26

*Mpoy v. Rhee*,
    758 F.3d 285 (D.C. Cir. 2014) ........................................ 14, 15, 16, 17, 18

*Navab-Safavi v. Glassman*,
    637 F.3d 311 (D.C. Cir. 2011) ........................................ 11

*Orange v. District of Columbia*,
    59 F.3d 1267 (D.C. Cir. 1995) ........................................ 7, 8, 11

*Papasan v. Allain*,
    478 U.S. 265 (1986) ........................................ 6

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ........................................ 12

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ........................................................... 12

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................... 26

*Spagnola v. Mathis*,
   859 F.2d 223 (D.C. Cir. 1988) ........................................... 25

*Sparrow v. United Air Lines, Inc.*,
   216 F.3d 1111 (D.C. Cir. 2000) ....................................... 3, 4, 5

*Thompson v. District of Columbia*,
   530 F.3d 914 (D.C. Cir. 2008) ......................................... 15, 18

*Tripp v. Dep't of Def.*,
   193 F. Supp. 2d 229 (D.D.C. 2002) .................................. 25-26

*United States v. Nat'l Treasury Emps. Union*
   513 U.S. 454–66 (1995) ..................................................... 11

*Waters v. Churchill*,
   511 U.S. 661 (1994) ........................................................... 11

*Wilburn v. Robinson*,
   480 F.3d 1140 (D.C. Cir. 2007) ................................. 11, 15, 18

*Winder v. Erste*
   566 F. 3d 209 (D.C. Cir. 2009) ....................................... 15, 16

## Statues and Regulations

5 U.S. Code § 3301 ............................................................... 26
5 U.S.C. § 2301 ..................................................................... 24
5 U.S.C. § 2302 ..................................................................... 27
5 U.S.C. § 7511 ................................................................ 20, 27
29 U.S.C. § 1002 .................................................................... 9
29 U.S.C. § 1003 .................................................................... 9
29 U.S.C. § 1162 .................................................................... 9
5 C.F.R. § 317.601 ................................................................ 26
5 C.F.R. § 359.902 .................................................................. 8

## INTRODUCTION

Plaintiff Kevin Chmielewski is a former high-level political appointee in the Trump Administration.[1]  From May 2017 to his alleged separation on February 12, 2018, Plaintiff worked at the Environmental Protection Agency ("EPA") as (now former) Administrator Scott Pruitt's Deputy Chief of Staff for Operations.  At some point during Plaintiff's tenure, he disagreed with the Administrator about the propriety of the Administrator's travel arrangements: Plaintiff alleges that he objected directly to the Administrator and refused to book travel he believed was unauthorized.  Their close working relationship soured, and Plaintiff was asked to resign or told he would be fired.  Following his separation from EPA, Plaintiff met with Congressional staffers about the Administrator's conduct and gave comments to several news media outlets.  He even took personal credit for the Administrator's downfall.  But Plaintiff nonetheless applied for a new political appointment within the Trump Administration in March 2020, this time at the Department of Energy ("DOE").  Although he completed two interviews, he was not hired for the position.

Plaintiff now challenges both his separation from EPA and his non-selection from DOE. Count One of his Complaint asserts two claims under the First Amendment's speech clause: wrongful separation by EPA and refusal to hire by DOE.  Count Two asserts two claims under the Fifth Amendment's due process clause.  First, Plaintiff asserts that he had a property interest in his continued employment at EPA, and that his separation violated due process.  Second, he alleges that he had a statutorily created property interest in the continuation of his health insurance under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), and that his loss of that insurance violated due process as well.

---

[1]   For this Motion only, Defendants accept as true the factual allegations included in Plaintiff's Complaint.

Defendants now move to dismiss Plaintiff's Complaint (ECF No. 1) under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because the Complaint fails to state a claim against either EPA or DOE.  To begin with, Plaintiff's Fifth Amendment claims fail because, as a political appointee, he lacked any property interest in his continued employment.  Likewise, he had no property interest in his health insurance under COBRA because that law does not apply to plans sponsored by the Federal Government.  Moreover, he has sought no relief on that claim, which would not be redressable now, more than three years after his separation from EPA.

Plaintiff's First Amendment claims fare no better.  Reasonably construed, the Complaint alleges a sole instance of First Amendment activity prior to his separation from EPA—objections about booking travel—made within his chain of command directly to Administrator Pruitt.  Under well-established Supreme Court precedent, these allegations do not constitute protected speech, as he has failed to allege that he spoke on a matter of public concern as a citizen, rather than pursuant to his official duties as a key political deputy to Administrator Pruitt.  *See Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006).  Even assuming Plaintiff could meet this threshold step, his claim against EPA would still fail.  Because Plaintiff was a policy-level employee, it was permissible for EPA to remove him for opposing the Administrator's policy decisions.  Similarly, even taking Plaintiff's allegations about his post-separation First Amendment activity as true, and assuming for the sake of this motion that DOE refused to hire him because of that activity (it did not), DOE would still have been within its rights in declining to hire him for his speech because of the policy nature of the political appointment he sought.

Finally, even if Plaintiff had stated a claim, the core relief he seeks is unavailable.  There is no authority for a court to install Plaintiff into a political appointment, let alone in a new Administration of a different political affiliation than that of Plaintiff.  Under longstanding political

association precedent, Plaintiff cannot reasonably expect that he would be able to serve in a political position in a new Administration of an opposing political party from his own.

For these reasons, this Court should dismiss Plaintiff's complaint.

## BACKGROUND[2]

On April 25, 2017, Plaintiff began his brief stint at EPA as Director of Scheduling, a GS-14 position.  Less than three months later, on July 2, 2017, he voluntarily left that position to accept a non-career position as the "Administrator's Deputy Chief of Staff for Operations," a high-level political appointee position in the Senior Executive Service ("SES").  *See* Compl. ¶¶ 1, 11-12.  As part of his duties as Deputy Chief of Staff for Operations, Plaintiff was required to approve travel logistics and expenditures and sign related travel paperwork.  *Id.* ¶¶ 24-25.  During his tenure, Plaintiff perceived that (now former) Administrator Pruitt was violating the Federal Travel Regulation.  *Id.*  Plaintiff allegedly told the Administrator that he "objected [to] travel logistics or expenditures [that] were not allowed"; Plaintiff also "refused to sign paperwork after [a] trip because it was a violation of the [Federal Travel Regulation]."  *Id.*  At some point in February 2018, Corey Lewandowski, a Trump political operative, purportedly told Plaintiff that the Administrator knew about certain disclosures Plaintiff allegedly had made.[3]  *Id.* ¶ 50.

---

[2]     On March 31, 2021, the EPA's Office of the Inspector General released a personnel investigation report that addresses facts underlying the allegations pleaded in the Complaint.  This Report has no bearing on Defendants' Motion to Dismiss, which under Rule 12(b)(6) assumes the truth of the factual allegations as pleaded in the Complaint and gives Plaintiff the benefit of all inferences.  *See, e.g.*, *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (explaining that in evaluating a 12(b)(6) motion, the court must treat "the complaint's factual allegations as true, and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged") (internal citation and quotation marks omitted).

[3]     The Complaint does not specify what "disclosures" were made during his EPA tenure, other than the specific objection he made to the Administrator regarding travel, *see* Compl. ¶¶ 24-25.

Plaintiff's working relationship with the Administrator went downhill, and the Administrator sought his immediate resignation. *Id.* ¶ 38. Plaintiff refused to sign his resignation form. *Id.* On Feb 9, 2018, an EPA security agent requested Plaintiff's parking pass. *Id.* ¶ 37. Then, on February 12, 2018, Plaintiff was "was stripped of his access authorization and removed from the building." *Id.* ¶ 39; *see also id.* ¶¶ 1, 13. On April 20, 2018, Plaintiff received personnel documents "representing that he had resigned on March 17, 2018". *Id.* ¶ 41. Plaintiff made no other disclosures prior to his separation from EPA on February 12, 2018, although he had knowledge of other improper activities by the Administrator. *See id.* ¶¶ 1, 13, 19-33.

After his separation from EPA, Plaintiff met with staffers from the House Oversight and Government Reform Committee in mid-April of 2018. *Id.* ¶ 33. He also engaged in a media campaign, going so far as to personally—as one outlet described it—"Take Credit for Pruitt's Downfall." *See id*. ¶ 35(e). On unspecified dates, Plaintiff alleges he also made disclosures regarding the Administrator's "violation of travel policies and laws" to the Administrator's Chief of Staff Ryan Jackson, the White House Liaison for EPA, Charles Munoz, and "appropriate White House budgetary and administrative officials." *Id.* ¶ 19. Plaintiff further alleges that "many of his disclosures were subsequently confirmed in whole or in part by EPA's Office of Inspector General," but he does not specify the content of these disclosures, the timing of these disclosures, or to whom they were made. *Id.* ¶ 20.

Approximately two years after his separation from EPA, in mid-March of 2020, Plaintiff received a call from the White House Personnel Office about potential GS-15 level political appointments, including a job as Trip Director for the Secretary or Deputy Secretary of DOE. *Id.* ¶ 15. The following week, staff in the White House Personnel Office asked Plaintiff for an updated resume as well as an "Updated Research Questionnaire for Loyalty to President Trump"; they also

sent him a SKC-SES Bio Sheet[4] for the position. *Id.* ¶ 16. "This correspondence was also sent to the White House Liaison to Department of Energy Jonathan Wetzel." *Id.* ¶ 16. Plaintiff received an initial interview at the end of March 2020 with Mr. Wetzel. *Id.* ¶ 17. On April 2, 2020, Plaintiff had a subsequent interview with the DOE Deputy Secretary's Chief of Staff, Sophia Varnasidis. *Id.* ¶ 18. After the interview, Ms. Varnasidis told Plaintiff that "they would like him to be part of the team" and to wait for her office and the Presidential Personnel Office to contact him. *Id.* Ultimately, however, Plaintiff did not receive the political appointment. *Id.* ¶ 17, 45.

Plaintiff challenged his separation from EPA at both the Merit Systems Protection Board and the Office of Special Counsel. *Id.* ¶ 3. He also challenged his non-selection at DOE before the Office of Special Counsel. *Id.* He was unsuccessful on all three counts. *Id.* As a political appointee, Congress expressly excluded him from protections under both the Civil Service Reform Act ("CSRA") and the Whistleblower Enhancement Protection Act. *Id.* Plaintiff then filed this lawsuit.

## LEGAL STANDARD

Under Rule 12(b)(6), the Court may dismiss a complaint where a plaintiff fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When resolving a motion to dismiss pursuant to Rule 12(b)(6), the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *See Iqbal*, 556 U.S.

---

[4] An "SKC-SES Bio Sheet" is a White House Personnel Office document that applicants for political appointments in the SES must complete in order to begin the security clearance process.

at 678.  However, a court is not required to accept conclusory allegations or unwarranted factual deductions as true.  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Likewise, a court need not "accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  The focus is on the language in the complaint and whether that sets forth sufficient factual allegations to support a plaintiff's claims for relief.

## ARGUMENT

Plaintiff's Complaint fails to state a claim against either EPA or DOE.  Plaintiff's Fifth Amendment claims against EPA fail for two reasons.  First, as a political appointee, he lacked any property interest in his continued employment.  Second, he had no property interest in his health insurance under COBRA because that law does not apply to plans sponsored by the Federal Government.  Plaintiff's Fifth Amendment claims must therefore be dismissed.

Plaintiff's First Amendment claims must likewise be dismissed.  As to his First Amendment claim against EPA, Plaintiff has not alleged sufficient facts to show that his speech made prior to his separation from the agency was made as a citizen, rather than as an employee pursuant to his official duties.  Even if he had spoken as a citizen, Plaintiff's First Amendment claim against EPA would still fail because he was a policy-level employee opposing the policies of his superiors.  Plaintiff's First Amendment claim against DOE fails for a similar reason.  Even accepting as true Plaintiff's conclusory allegations that DOE refused to hire him because of his speech activity (it did not), DOE was entitled to consider whether Plaintiff would be compatible for the policy position he sought.  Finally, even if Plaintiff had stated a claim, the core relief he seeks is unavailable.

I.  **Plaintiff Fails to State a Claim for a Due Process Violation Because He Lacks Any
Property Interest in His At-Will Political Appointment.**

Plaintiff alleges that he was separated from EPA without due process.  But as a political
appointee, Plaintiff was an at-will employee, excluded from the protections of the CSRA, and thus
was not entitled to any due process.  Because Plaintiff has alleged no facts that might show a
property interest in his continued employment at EPA, his due process claim should be dismissed.

To prevail on a due process claim, a plaintiff must first show a property interest "in
continued employment."  *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985).
"Property interests," the Supreme Court has held, "are created and their dimensions are defined by
existing rules or understandings that stem from an independent source such as state law[,]" *Bd. of
Regents v. Roth,* 408 U.S. 564, 577, (1972), or "statutes or regulations," *Hall v. Ford*, 856 F.2d
255, 265 (D.C. Cir. 1988).  In determining whether a plaintiff has a property interest in continued
employment, courts look at the nature of the employment, which generally falls into one of two
categories for government employees: terminable at will and terminable only for cause.  *Id.*
Employees "who are terminable at will have no property interest in their employment because
there is no objective basis for believing that they will continue to be employed indefinitely."
*Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (citing *Hall*, 856 F.2d at 265;
*see also Roth*, 408 U.S. at 577–78 (no property interest arises when contract for limited term
expires and is not renewed).

Plaintiff's allegations regarding his employment at EPA fall well short of establishing a
property interest in either of the two positions he briefly held at EPA.  To begin with, any property
interest Plaintiff may have eventually acquired in his alleged career civil service position as a

Director of Scheduling at EPA upon completion of a probationary period,[5] *see* Compl. ¶64, would have been relinquished when he voluntarily left that job to accept a political appointment as the Administrator's Deputy Chief of Staff for Operations, *id.* at ¶ 12.  *See, e.g.*, *Lawrence v. Acree*, 665 F.2d 1319, 1325 (D.C. Cir. 1981) (holding that plaintiff who quits voluntarily has "no basis" for claiming a property interest in continued employment).

Plaintiff's due process claim for his political appointment similarly fails.  Plaintiff cites the "Conditions of Removal" regulation governing Senior Executive Service political appointments to show he had a property interest in his position as Deputy Chief of Staff for Operations, but the regulation shows the opposite.  The very first subsection of the regulation, titled "Authority," could not be clearer: "The agency may remove an appointee subject to this subpart *at any time*."  5 C.F.R. § 359.902(a) (emphasis added).  Put simply, Plaintiff's position was terminable at will.  *See Harris v. D.C. Water & Sewer Auth.*, 195 F. Supp. 3d 100, 104 (D.D.C. 2016) (adopting the Black's Law Dictionary's definition of "at will" as employment that may be terminated "at any time").  And although the regulation also provides that the agency "shall notify the appointee in writing before the effective date of the removal," the regulation does not condition the agency's removal authority on such notice, but rather states that appointees are subject to removal "at any time."  5 C.F.R. § 359.902(a)-(b).  Plaintiff thus had "no objective basis for believing that [he] w[ould] continue to be employed indefinitely."  *Orange*, 59 F.3d at 1274; *see also Hall*, 856 F.2d at 265.  This result is unsurprising.  Although the CSRA provides qualifying federal employees within its coverage property interests in their continued employment, employees like Plaintiff,[6] who are excluded from

---

[5]     Plaintiff never actually held a career civil service position at EPA; he was originally hired as a non-career excepted service appointee.  However, for this Motion only, Defendants are accepting the facts as alleged in Plaintiff's Complaint as true.

[6]     *See* Compl. ¶ 3 (admitting that Plaintiff has "no right to any remedy as a non-career SES employee under the Civil Service Reform Act").

the CSRA, have no such property right.  *Lamb v. Holder*, 82 F. Supp. 3d 416, 424 (D.D.C. 2015)

(citing *Garrow v. Gramm*, 856 F.2d 203, 205–06 (D.C. Cir. 1988).  Plaintiff's due process claims

regarding his positions at EPA should thus be dismissed.[7]

## II.  Plaintiff Has Failed To State a Due Process Claim for the Termination of His Health Insurance.

Similarly, Plaintiff must identify a property interest created by an independent source to

state a due process claim for the termination of his health insurance.  *See Roth*, 408 U.S. at 577.

He has not done so here.  Although Plaintiff alleges that 29 U.S.C. § 1162 of COBRA provided

him a statutorily defined property interest in his health insurance, *see* Compl. ¶ 67, that statute

applies only to health plans sponsored by private-sector employers.  29 U.S.C. § 1003(b)(1)

(excluding "governmental plans" from coverage); *see also* 29 U.S.C. § 1002(32) (defining

"governmental plan" as any "plan established or maintained for its employees by the Government

of the United States").  COBRA does not apply to health plans sponsored by the federal

government, and, for that reason, Plaintiff's due process claim regarding the termination of his

health insurance should be dismissed.[8]  *Id.*  What is more, Plaintiff has not sought any relief on

---

[7]      If Plaintiff seeks to bring a cause of action based solely on EPA's alleged failure to follow procedural regulations governing disciplinary actions for non-career SES appointees that claim likewise fails.  Where the CSRA precludes relief for a disciplinary action, an agency's alleged failure to follow disciplinary procedures set forth by regulation does not provide an independent cause of action.  *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (holding that although the "FBI violated its own regulations in taking personnel action against [the plaintiff,]" there was no cause of action because the "CSRA preclude[d] judicial review").

[8]      There is a federal corollary to COBRA known as Temporary Continuing Coverage, which applies to government health plans, but that coverage is an entirely different statutory scheme than the COBRA provisions cited by Plaintiff in his Complaint.  Moreover, at least one court has held that because the option to elect continuing coverage is subject to the agency's discretionary determination regarding whether the employee has engaged in gross misconduct, "it cannot be said that the requirement to offer continuing health coverage so constrains agency discretion as to create a property interest in the option for health insurance."  *Lamb*, 82 F. Supp. 3d at 425.

this claim.  That reason alone is sufficient for dismissal.  *See, e.g.*, *Brancaccio v. Reno,* 964 F. Supp. 1, 2 n.4 (D.D.C. 1997), *aff'd*, No. 97-5136, 1997 WL 634544 (D.C. Cir. Sept. 24, 1997) (dismissing under 12(b)(6) claim on which Plaintiff sought no relief).  Because Plaintiff has failed to state a due process claim with respect to either his employment or his health insurance, Count II of the Complaint should be dismissed in its entirety.

### III.  Plaintiff's Complaint Fails to Allege Operative Facts Showing First Amendment Retaliation by either Agency.

Plaintiff has failed to allege any facts to show First Amendment retaliation by either EPA or DOE.  Under the framework governing public employees' First Amendment speech rights, Plaintiff cannot meet the threshold requirement to state a First Amendment claim against EPA because he spoke as an employee pursuant to his official duties, rather than as a citizen.  Even if Plaintiff could get past that step, his separation from EPA would still have been permissible because of the policy nature of his political appointment as Deputy Chief of Staff for Operations.  And as to DOE, even assuming that his post-separation speech was made as a citizen on a matter of public concern, DOE would have similarly been entitled to decline to hire him because of the policy nature of the political appointment he sought.

### A.  Applicable Public-Employment Framework for Plaintiff's First Amendment Claim

#### 1.  The Four Step *Pickering* Test Applies.

As a general matter, the Supreme Court's decision in "*Pickering* and its progeny continue to be the meter by which the First Amendment rights of public employees are measured." *Baumann v. District of Columbia*, 795 F.3d 209, 215 (D.C. Cir. 2015) (citations omitted); *see also, e.g., Lane v. Franks*, 573 U.S. 228 (2014).  Under this framework, individuals do not forfeit their First Amendment rights when they accept government employment, but the government "has interests as an employer in regulating the speech of its employees that differ significantly from

those it possesses in connection with regulation of the speech of the citizenry in general." *Navab-Safavi v. Glassman,* 637 F.3d 311, 315 (D.C. Cir. 2011) (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968)).  Acting as an employer rather than as the sovereign, the government has "far broader powers" in restricting speech otherwise protected by the First Amendment.  *Waters v. Churchill*, 511 U.S. 661, 671 (1994).

To establish a First Amendment violation, a public employee must meet several elements under *Pickering*.  First, the public employee must have spoken as a private citizen, addressing matters of public concern.  *See Garcetti*, 547 U.S. at 422; *Orange*, 59 F.3d at 1272; *Baumann*, 795 F.3d at 215.  Second, if the "private citizen/public concern" requirement is met, then the court "must 'arrive at a balance between the interests of the employee, [as] a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *United States v. Nat'l Treasury Emps. Union ("NTEU")*, 513 U.S. 454, 465–66 (1995) (original alteration omitted) (quoting *Pickering*, 391 U.S. at 568).  Third, the employee must show that his or her speech was a substantial or motivating factor in prompting the challenged personnel action.  *Wilburn v. Robinson,* 480 F.3d 1140, 1149 (D.C. Cir. 2007) (quotation marks, citations, and alterations omitted).  Finally, the employee must refute any showing by the government employer that it would have reached the same decision in the absence of the protected speech.  *Id.*  The first two of these four questions are questions of law for the court to resolve.  *Navab-Safavi*, 637 F.3d at 316.

2.  Step Two of the *Pickering* Balancing Test is Modified for Policy-Level
    Employees.

*Pickering*'s second step requires the Court to balance competing interests: it must weigh the plaintiff's interest "as a citizen, in commenting upon matters of public concern[,]" against the government's interest "as an employer, in promoting the efficiency of the public services it

performs through its employees." *Pickering,* 391 U.S. at 568; *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016). This balancing may entail several factors: among them, "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Moreover, a government employer can act before an employee's speech actually disrupts the functioning of an office. *Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity . . . for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

An analogous balancing test, known as the *Elrod–Branti*[9] test, developed in a line of freedom of belief and association cases that permit dismissals for certain policy-level employees (sometimes described as "policymakers," "key deputies," and "confidential employees")[10], also applies in *Pickering* cases. *Hall*, 856 F.2d at 261-63.[11] As the court explained, the general rule is that "the government cannot condition employment on the compromise or relinquishment of a constitutional right, be it freedom of belief and association," (*Elrod–Branti*) "or freedom of speech (*Pickering*)." *Hall*, 856 F.2d at 262-63. But this general rule is not without limit, because the

---

[9]     The name for this test comes from two seminal cases involving political affiliation dismissals: *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507, 517 (1980).

[10]     "Policy-level employees" includes not just "policymakers," but also those who "implement" policy, including "key deputies" and "confidential" employees who serve at the behest of the policymaking official. *Hall*, 856 F.2d at 262-265

[11]     The Court can draw reasonable inferences about potential harm to the government-as-employer stemming from employee speech. *Hall*, 856 F.2d at 261.

government has a legitimate interest in efficient operations that sometimes carries greater weight than an individual employee's exercise of his or her constitutional freedoms.  *Id.*

Thus, courts applying *Elrod–Branti* afford government employers even greater latitude in dismissing certain policy-level employees, reflecting the importance of allowing officials at the top of the organizational hierarchy to implement their policies through politically compatible deputies.  *Hall*, 856 F.2d at 263.  Such employment decisions are broadly permissible because "[i]n order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance."  *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241 (1st Cir. 1986) (en banc); *see also Elrod*, 427 U.S. at 367; *Grossart v. Dinaso*, 758 F.2d 1221, 1226 (7th Cir. 1985) ("Elected officials must be able to rely on the political loyalty of a policymaking civil servant in order to seize the reigns [sic] of government and realize their electoral mandate.").

Tailored for *Pickering* speech cases, the test for identifying a qualifying government interest in political affiliation is as follows.  The Court first asks "whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation."  *Hall*, 856 F.2d at 264.  In other words, the Court asks whether the position is in a policy area and, if so, "whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation," *i.e.* whether the individual is a policy-level employee.  *Id.*  If both criteria are met, the Court asks then "whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech" on policy areas for which the employee is responsible.  *Id.*

- 13 -

**B. Plaintiff Fails to State a First Amendment Claim Against EPA: He Spoke Not as a Citizen, but as an Employee Pursuant to his Official Duties, and Lacked First Amendment Protection as a Policy-Level Employee.**

Measured against that doctrinal backdrop, Plaintiff's claim against EPA does not meet the threshold step under *Pickering* because he spoke not as a private citizen in addressing matters of public concern, but as an employee pursuant to his official duties.  Even if it could get past that threshold step, Plaintiff's claim against the EPA would still fail.  Plaintiff's policy disagreement with the Administrator involved matters within the core of his responsibilities such that the Administrator could no longer expect him to carry out his policy choices effectively.  Because Plaintiff's activities did not constitute speech protected by the First Amendment, Count I should be dismissed as to EPA.

>    1.  <u>Plaintiff's Complaint Fails to State a Claim Against EPA because he Spoke Not as a Citizen, but as an Employee.</u>

Plaintiff's Complaint does not get past the threshold step for a First Amendment claim because he spoke not as a citizen in addressing matters of public concern, but pursuant to his duties as Deputy Chief of Staff for Operations.

For Plaintiff's speech to qualify for potential First Amendment protection under *Pickering*'s step one, he "must have spoken (1) as a citizen, and (2) on a matter of public concern." *Mpoy v. Rhee*, 758 F.3d 285, 290 (D.C. Cir. 2014); *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (noting that *Garcetti* added a "threshold layer" that focused first on the "role the speaker occupied" before focusing on "the content of the speech").  As to the first requirement—that Plaintiff have spoken as a citizen rather than an employee—the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

Applying this precedent, the D.C. Circuit has repeatedly held that even reports of misconduct or other wrongdoing made "pursuant to . . . official duties" do not constitute speech protected by the First Amendment.  *Mpoy*, 758 F.3d at 290-91 (citing several cases applying *Garcetti* to hold an employee's reports of misconduct—and even testimony—fell outside the scope of First Amendment protection).  The reason for this is simple: "a public employee cannot claim a constitutional cause of action behind a statement made in the course of doing his or her job."  *Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007) (internal quotation marks and alterations omitted).  In *Wilburn*, for example, the D.C. Circuit held that allegations made by the director of the D.C. Office of Human Rights regarding pay discrimination had been made pursuant to her official duties, which included rooting out discrimination in employment, and were thus not protected speech.  480 F.3d at 1151.  Similarly, in *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008), the D.C. Circuit held that the chief of security for the D.C. Lottery Board was speaking pursuant to his official duties, which included investigating financial improprieties, when he reported financial misconduct found as a result of his investigations to Lottery Board officials.  And in *Winder v. Erste*, 566 F. 3d 209, 214-15 (D.C. Cir. 2009), the D.C. Circuit held that D.C. Public Schools' transportation manager was not entitled to First Amendment protection for "his testimony before the D.C. Council, his reports to the . . . Special Master, and his complaint to the D.C. Inspector General" about others' failure to follow court orders related to transportation of special education students, because his duties included implementation of those court orders as well as regular reports to the Special Master.  In short, then, "a public employee speaks without First Amendment protection when he reports conduct that interferes with his job

- 15 -

responsibilities, even if the report is made outside his chain of command." *Winder*, 566 F.3d at 215.[12]

In determining whether an employee spoke pursuant to his official responsibilities, it is not enough to look solely at the content of the speech and its relation to the employee's job duties; rather, the court must also "take a hard look at the context of the speech." *Mpoy*, 758 F.3d at 292. For example, in *Mpoy*, a District of Columbia public school teacher, frustrated with the actions of his principal, wrote an email to the school district's chancellor outlining a series of complaints. *Id.* at 292-93. While acknowledging that most of his email directly addressed conduct that interfered with his job duties (*e.g.*, the principal enabling disruptive classroom aides), the plaintiff argued that one part constituted citizen speech on a matter of public concern: an allegation that the principal had misrepresented his students' test scores. The plaintiff likewise argued that going directly to the chancellor meant that he had made that speech outside the chain of command. *Id.* The D.C. Circuit disagreed, explaining that the allegation focused on the alleged manipulation of the plaintiff's students' scores and that the outreach to the chancellor was an "internal channel" by which the teacher clearly sought improvement of conditions related to his job duties; indeed, the plaintiff identified himself as a teacher in both the opening paragraph and the closing signature, thus indicating he was writing in his "capacity as a teacher." *Id.* at 293-94. Thus, the context

---

[12]     The Supreme Court has also held that the First Amendment "protects a public employee who provided truthful sworn testimony, compelled by subpoena," at least where testifying was outside the scope of the employee's "ordinary job responsibilities." *Lane*, 573 U.S. at 231, 238; *see also id.* n.4. In so holding, the Court focused particularly on the nature of compelled testimony, specifically the fact that "[a]nyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." *See id.* at 238-41. However, because it was "undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings," *id.* at 238 n.4, the Court, as in *Garcetti*, had no occasion to consider how the scope of such responsibilities should be determined in other circumstances. *Mpoy*, 758 F.3d at 294. Thus, the D.C. Circuit noted that it was not clear that *Lane* conflicted with its earlier ruling in *Winder* and has not had to reach that issue yet. *Mpoy*, 758 F.3d at 294-95.

made clear that the entire email, including the test score allegations, was directly related to the plaintiff's job duties as a teacher and was, therefore, not protected speech. *Id.* at 294.

So too here: both the content of the speech as it relates to Plaintiff's job duties, and the context of his speech, make clear that he spoke out not as a citizen, but as an employee. Though the Complaint details former Administrator Pruitt's alleged improprieties (*see* Compl. ¶¶ 22-25) and generally alludes to "disclosures" Plaintiff allegedly made on some unknown date (*see* Compl. ¶¶ 1, 19), it actually alleges only two instances of potentially protected activity prior to Plaintiff's separation from EPA: (a) Plaintiff's objection to the Administrator regarding certain travel logistics and expenditures that he perceived to be unlawful, presumably in 2017 or prior to his dismissal in 2018, Compl. ¶ 24; and (b) Plaintiff's refusal to sign "paperwork" following a Morocco trip that he believed violated certain laws and regulations, presumably in late 2017,[13] Compl. ¶ 25. These allegations make clear that, as Deputy Chief of Staff for Operations, Plaintiff was responsible for arranging the Administrator's travel and signing off on travel-related paperwork for the Administrator and other senior aides, but Plaintiff felt that he could not perform those job duties because of his disagreement with the Administrator about the implementation of the Federal Travel Regulation. *See* Compl. ¶¶ 24-25 (suggesting that the only reason Plaintiff objected to these travel arrangements was his perception that they were unlawful, rather than that they were outside of his job duties). Plaintiff's disclosure related to the Administrator's travel, then, does no more than report conduct "that interfere[d] with [Plaintiff's] job responsibilities" to handle travel logistics and expenditures. *See Mpoy,* 758 F.3d at 291-92. Just like the chief of

---

[13]     Publicly available information indicates that the Morocco trip took place in early December of 2017. *See, e.g.,* Juliet Eilperin, *Scott Pruitt and a crew of EPA aides just spent four days in Morocco promoting natural gas,* WASH. POST, https://www.washingtonpost.com/news/energy-environment/wp/2017/12/13/scott-pruitt-and-a-crew-of-epa-aides-just-spent-four-days-in-morocco-promoting-natural-gas/ (Dec. 13, 2017).

security for the D.C. Lottery Board who reported financial misconduct to Lottery Board officials, *see Thompson*, 530 F.3d at 918, the director of D.C.'s Office of Human Rights who reported on unlawful pay discrimination, *see Wilburn*, 480 F.3d at 1151, and the public school teacher who emailed the chancellor with allegations that his principal misrepresented test scores, *see Mpoy*, 758 F.3d at 292-93, Plaintiff spoke pursuant to his official duties when he complained to the former Administrator regarding travel expenditures and when he refused to sign paperwork regarding unlawful trip expenses.

The context of Plaintiff's speech confirms this analysis. Plaintiff made his pre-separation disclosure at work to the Administrator, whom he worked for directly. Compl. ¶ 12. Like the teacher in *Mpoy*, then, Plaintiff made his objections through an "internal channel" within the chain of command. *See Mpoy*, 758 F.3d at 294 (holding that disclosure to school district's chancellor was still an "internal channel" for teacher to report issues, even though the teacher had skipped over several other more inferior officers in making his disclosures). This context makes plain that Plaintiff spoke in his "capacity" as the Administrator's Deputy Chief of Staff for Operations in reporting conduct that interfered with his job duties, rather than as a private citizen. *See id.* For that reason, Plaintiff's pre-separation speech—no matter its public value—was not protected by the First Amendment.

    2.   <u>Even if Plaintiff's Pre-Separation Speech Satisfied the Threshold Step of *Pickering*, the Balancing Test would Still Weigh in EPA's Favor.</u>

Even if Plaintiff could show that his pre-separation speech satisfied *Pickering*'s step one, his retaliation claim against EPA would fail for a different reason: his Complaint allegations fail to state a claim under the *Pickering* balancing test as it applies to policy-level employees.

Under the modified *Pickering* balancing test, *see supra* Part III(A)(2), a policy-level employee speaks without First Amendment protection when the "the government interest in

accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech." *Hall*, 856 F.2d at 264.  Put differently, a policy-level employee speaks without First Amendment protection when his speech implicates a "policy disagreement with his superiors such that they c[an]not expect [the employee] to carry out their policy choices vigorously." *Id.* at 265.  This is true even for employees, who, although not policymakers themselves, are responsible for "implement[ing]" or "carry[ing] out" the policy objectives of their policymaking superiors, and thus, still qualify as policy-level employees. *Id.* at 264-65.

As applied in *Hall*, the D.C. Circuit found that the athletic director of a public university could be dismissed for making public statements about his perception that the school's athletic department was violating rules established by the National Collegiate Athletic Association ("NCAA") and the school itself. *Id.*  The court reasoned that, as the athletic director, the plaintiff's position related to a policy area, and his duties, which included "implementation of the University's broad goals" as set forth by the President and the Board, made him a policy-level official. *Id.* at 265 (*quoting Elrod*, 427 U.S. at 368).  In so holding, the court noted that the statutory provisions governing the director's excepted service employment defined him as a "confidential" or "policymaking" employee, and that he reported directly to the President and the Board, thus providing additional evidence of the director's status as a policy-level employee. *Id.* at 264-65.  As a result, the university "had a significant interest in ensuring that [plaintiff] was, and was perceived to be, compatible with the President and the Board [and plaintiff's] speech directly interfered with this interest, as he engaged in a pattern of opposition to the policies of his superiors." *Id.*

Like the athletic director in *Hall*, Plaintiff's position related to a policy area.  Plaintiff's job duties required him to arrange the Administrator's travel. *See* Compl. ¶ 24.  Because he was

arranging travel for a cabinet-level Secretary, Plaintiff's work had clear policy implications and thus relates to a policy area.  And as the Administrator's Deputy Chief of Staff for Operations, Plaintiff was a policy-level employee: the statutory provisions governing his employment, his relationship with the Administrator, and his job duties all confirm as much.  As with statutory provisions governing the athletic director's excepted service employment in *Hall*, the statutory provisions governing Plaintiff's political appointment in the Senior Executive Service similarly define the "policy" or "confidential" nature of his employment.  5 U.S.C. § 7511(b)(2) (excluding positions like Plaintiff's that have "been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" from the procedural protections of the CSRA).  Further, as in *Hall*, Plaintiff reported directly to the policy making official, former Administrator Pruitt.  *See* Compl. ¶ 24 (disagreeing about the implementation of travel regulations directly with the Administrator); *see also* Compl. ¶ 12 (describing his position at the EPA as the "Administrator's Deputy Chief of Staff for Operations").  Accordingly, Plaintiff was responsible for arranging travel in a manner that advanced the "implementation of the [Administrator's] broad goals" for the agency.  *See Hall*, 856 F.2d at 265.  Because he was responsible for "carry[ing] out" the policies of the Administrator, Plaintiff was a policy-level employee.  *See id.*

Assuming the truth of Plaintiff's allegations that his separation from EPA was the result of his speech regarding former Administrator Pruitt, it would have nevertheless been permissible for EPA to remove him on grounds that he had clashed with his cabinet-level superior about the implementation of travel regulations.

To be clear, Plaintiff's involvement in flagging potentially troubling conduct by EPA Administrator Pruitt during his political-appointee tenure with the EPA served worthy purposes.  But the validity of Plaintiff's concerns is not relevant in assessing whether he has stated a First

Amendment claim.  Ultimately, as with the university athletic director in *Hall*, EPA "had a significant interest in ensuring that [plaintiff] was, and was perceived to be, compatible with [the Administrator]," and Plaintiff's pre-separation speech interfered with that interest, "as he [had] engaged in a pattern of opposition to the policies of his superiors."  856 F.2d at 264.  Indeed, Plaintiff had not only opposed the former Administrator's implementation of the Federal Travel Regulation, but also refused to perform his job responsibilities because of that policy disagreement. *See* Compl. ¶¶ 24-25.  His close relationship with the Administrator deteriorated as a result, *see* Compl. ¶ 38, and he was no longer a compatible political deputy who could be counted on by former Administrator Pruitt to advance EPA's organizational objectives.  *See Hall*, 856 F.2d at 264.  Thus, even assuming that Plaintiff's pre-separation speech was made as a public citizen, rather than as an employee, he still has failed to state a claim.

Plaintiff's First Amendment claim against EPA should thus be dismissed for failure to satisfy either of the first two steps of the *Pickering* test.

### C.  Plaintiff's Complaint Fails to State a First Amendment Claim Against DOE because the *Pickering* Balancing Test Weighs in DOE's Favor.

Plaintiff's failure-to-hire claim against DOE similarly fails.  Even assuming that his post-separation speech meets the threshold requirement for First Amendment protection, Plaintiff would still need to satisfy the second step, the *Pickering* balancing test, to state a First Amendment claim against DOE.  He cannot do so here.  The positions he sought at DOE were policy-level positions.  And notwithstanding its public value, his speech regarding his time at EPA made clear that he disagreed with certain members of the Administration; it would therefore be reasonable for DOE to conclude he was not likely to be a compatible political deputy who could be counted on by his would-be DOE superiors to advance DOE's organizational objectives.  Thus, even assuming

the truth of Plaintiff's conclusory allegations that DOE refused to hire him because of his speech under Rule 12(b)(6), he still has failed to state a claim.

Following his separation from EPA, Plaintiff sought a new high-level political appointment with DOE, but DOE was under no obligation to select him for such an appointment.  The DOE position that he discussed with the White House Personnel Office and then applied for was a GS-15 level political appointment as Trip Director for either the Secretary or the Deputy Secretary. Compl. ¶ 15.  That role, which would have included implementing decisions about the timing and location of travel for the Secretary or Deputy Secretary and representing such high-level officials in meetings with other government agencies, Congress, and non-governmental entities, would have had clear policy implications.  Accordingly, DOE's political leadership would have had the greatest possible latitude in vetting any candidates for political compatibility, among other criteria.

Thus, even assuming the truth of Plaintiff's conclusory allegations that his non-selection was the result of his speech regarding the EPA Administrator, DOE would have been justified in not hiring him on grounds that he had publicly clashed with his prior cabinet-level superior about travel regulations—and had gone so far as to take credit for the Administrator's dismissal and even his "downfall" in news interviews.  *See* Compl. ¶ 35(e) (citing July 8, 2018 article in *The Hill* titled "Ex-aide Says He'll Take Credit for Pruitt's Downfall").  Indeed, under *Elrod*, *Branti*, and *Hall*, DOE permissibly could have determined that, given Plaintiff's public statements regarding former EPA Administrator Pruitt's conduct, placing him in a similar political position—one in which he would work closely with the Secretary or the Deputy Secretary in much the same way he had worked with former Administrator Pruitt—would not have been a good fit.

As with the university athletic director in *Hall*, DOE "had a significant interest in ensuring that [plaintiff] was, and was perceived to be, compatible with [potential superiors]," and Plaintiff's

prior speech—in particular, his negative comments to news media outlets—suggested that he might directly interfere with that interest, "as he [had] engaged in a pattern of opposition to the policies of his superiors." 856 F.2d at 264. And in making a decision whether to select Plaintiff for a high-level political appointment, DOE bore no obligation "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.

For these reasons, Plaintiff has failed to state a First Amendment claim against DOE.

## IV.   <u>The Core Relief Plaintiff Seeks—an Order Requiring His Appointment to a Government Position—Is Legally Unavailable Under these Facts.</u>

Finally, even had Plaintiff stated claims against either Defendant, the core relief he seeks—judicially-mandated installation into another political position in the current Administration—is legally unavailable. To Defendants' knowledge, Plaintiff's primary demand for relief might be singularly unusual in this era of federal government political personnel management: as a remedy for alleged constitutional violations committed by two federal agencies under a Republican presidential administration, he asks an Article III court to order the Executive Branch, now led by a successor Democratic presidential administration, to appoint him into a similar policy-level political position in one or the other. There is no precedent permitting the sort of order he seeks from the Court. Rather, that remedy would upset decades of political association precedent and suggest substantial separation-of-powers concerns. It should be dismissed as a matter of law.[14]

---

[14]     Plaintiff's Complaint does not explicitly seek back pay from the date of his separation from EPA (or from his unsuccessful efforts to obtain a political appointment with DOE), and Defendants do not construe the Complaint to implicitly seek such monetary relief. But if Plaintiff were to argue otherwise in opposing this motion, any such request would be unavailing. Unless otherwise specified by statute, back pay constitutes monetary damages, and there is no waiver of sovereign immunity that would permit an award of such relief under these circumstances. *See Hubbard v. Adm'r, E.P.A.*, 982 F.2d 531, 539 (D.C. Cir. 1992) (holding that an individual denied federal employment in violation of his constitutional rights was not entitled to back pay because there is no waiver of sovereign immunity for such monetary relief); *Davis v. Billington*, 51 F. Supp. 3d 97,

At the outset, the Court should dismiss out of hand Plaintiff's alternative demand for relief—that he be installed into a career position with EPA if no judicially mandated political appointment is to be had.  At his 2018 separation from EPA, Plaintiff held a political appointment. Likewise, the appointment he sought with DOE in 2020 (in coordination with the Trump Administration's Presidential Personnel Office) was political.  Because he was neither separated from nor denied a career position at either agency, he cannot now demand instatement into a career position at either as a remedy for his claims.  And even if he sought such a position on his own merits, he would have to satisfy strict requirements overseen by the U.S. Office of Personnel Management ("OPM") designed to guard against improper "burrowing" by current or recent political appointees into career Executive Branch positions.  To be clear, nothing prevents Plaintiff from seeking career employment with the federal government, and any such efforts on his part would be met fairly and equitably in accord with merit staffing principles, *see* 5 U.S.C. § 2301, as modified by OPM burrowing guidance, *see* OPM Memo on Political Appointees and Career Civil Service Positions (Feb. 23, 2018).  But instatement into a career position is not a remedy within a district court's power to award under the facts here, where Plaintiff was neither separated from nor denied a career position.

Turning back to Plaintiff's primary demand for relief—installation into a political position in the current Presidential administration—it should be dismissed as well for at least two reasons. First, it would run flatly counter to the Supreme Court's precedent governing political association in government employment.   Non-career political appointments, such as the high-level appointments Plaintiff asks to be installed into, represent just the sort of positions for which

---

111 (D.D.C. 2014) (holding that employee excluded from the CSRA's remedial provisions was entitled only to equitable relief for the alleged First Amendment violation and could not receive back pay or any other monetary relief).

political affiliation is an "appropriate requirement for the effective performance of the [ ] office involved." *Branti*, 445 U.S. at 518.  Indeed, the "political loyalty of [policy-level] employees" is critical to ensure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367.  Yet Plaintiff's appointment to either of the two political positions he seeks would do precisely what the Supreme Court has sought to guard against. Scarcely more than a year ago, Plaintiff completed his "Updated Research Questionnaire for Loyalty to President Trump" in pursuing a political appointment.  Compl. ¶ 16.  If Plaintiff—a Trump appointee—were to be instated into either of the two policy-level political appointments he now seeks in the Biden Administration, the Presidentially appointed and Senate-confirmed agency heads Plaintiff would serve could rightly be concerned about whether he would "carry out their policy choices vigorously." *Hall*, 856 F.2 at 265.  As a political appointee himself, Plaintiff should know firsthand the importance of loyalty and policy alignment in holding such senior-level political appointments, but he nevertheless asks this Court to break new ground and install him into an Administration with a political alignment opposite from his own.  This Court should reject that request.

Second, ordering that Plaintiff be appointed to a political position in the current Presidential administration would offend the Constitution's separation of powers.  Reinstatement is ordinarily available to "civil servants" for constitutional violations, *see, e.g.*, *Spagnola v. Mathis*, 859 F.2d 223, 230 (D.C. Cir. 1988); *Hubbard v. EPA*, 809 F.2d 1, at 11 (D.C. Cir.1986), but Defendants are aware of no authority to award similar relief to political appointees.  That is particularly so where it would require a successor administration of a different political party to appoint a former political appointee into its own political ranks.  *See, e.g., Tripp v. Dep't of Def.*, 193 F. Supp. 2d

229, 231 (D.D.C. 2002) (explaining that it is customary for political appointments to end when a new Administration takes over and that failing to resign warrants termination).  To the contrary, such judicially ordered relief would improperly interfere with the core functioning of the Executive Branch.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 675–76 (1988) (explaining that "separation-of-powers concerns" arise where appointments have "the potential to impair the constitutional functions assigned to one of the branches" of government); *Sampson v. Murray*, 415 U.S. 61, 83 (1974) (recognizing, in the context of a federal personnel dispute, that the court must take into account " the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,'' thus cautioning against the award of injunctive relief to plaintiff who fell largely outside the protections of the CSRA due to his probationary status).

The other coordinate branch of government, Congress, has explicitly recognized these principles in multiple ways.  For one, as a complement to the President's appointments power, Congress has given the President the right to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service."  5 U.S. Code § 3301(1).  In turn, those regulations provide that non-career political appointments are to be made by the agency, rather than through ordinary merit-hiring principles. *See* 5 C.F.R. § 317.601(a).

And for another, Congress has substantially restricted the ability of political appointees to seek relief for adverse personnel actions broadly available to career federal employees.  Under the CSRA, for instance, political appointees are not entitled to appeal statutorily defined adverse actions—such as removals, suspensions of fourteen days or more, or demotions with loss of pay— to the Merit Systems Protection Board, which adjudicates the vast majority of such claims by

career federal employees.  5 U.S.C. § 7511(b)(2) (excluding positions that have "been determined to be of a confidential, policy-determining, policy-making or policy-advocating character").  Nor are political appointees entitled to pursue more limited forms of relief for lesser personnel actions allegedly attributable to statutorily defined "prohibited personnel practices," including whistleblower retaliation.  *See* 5 U.S.C. § 2302(a)(2)(B)(i) ("covered position" does not include any position which is prior to the personnel action "excepted from the competitive service because of its confidential, policy-determining, policy-making, or policy-advocating character").  Indeed, in describing Congress's rationale for excluding political-appointee positions like Plaintiff's from the CSRA, the Act's legislative history explains that such exclusion is necessary because the "concept of tenure and protection against dismissal is contrary to the confidential relationship between incumbent and supervising official, and the commitment to Administration policy objectives, required by those filling such positions."  S.Rep. No. 969, 95th Cong., 2d Sess. 48 (1978), reprinted in 1978 U.S.C.C.A.N. 2770.  Suffice it to say the choice to exclude political appointees like Plaintiff was not an inadvertent one.  *See McGregor v. Greer*, 748 F. Supp. 881, 884 (D.D.C. 1990) (internal citations omitted) (explaining that "Congress did not overlook [political appointments] in drafting the CSRA; it specifically addressed it, providing no recourse for adverse personnel actions" and that "[t]o disturb this specific provision would impermissibly upset the balance Congress strove to achieve between federal employees' rights and an efficient government").

To be sure, if Plaintiff could state a colorable claim under the Constitution that otherwise satisfies Article III's case-or-controversy requirement, the Court presumably would have jurisdiction to consider its merits.  But as to the core relief Plaintiff seeks here, the Court should follow the Supreme Court's political-association precedent, as well as the course charted by

Congress in the CSRA, and reject Plaintiff's request.  Requiring the EPA or DOE to install Plaintiff as a political appointee would hinder the ability of their presidentially appointed and Senate-confirmed agency heads to choose those best suited to help them carry out the President's policy agenda.  Thus, in obviously practical ways, a judicially ordered political appointment of Plaintiff into the EPA or DOE would infringe on the separation of powers by imposing on the Executive Branch's appointment authority given to it by both Congress and the Constitution.

For those reasons, should the Court find that Plaintiff has stated a claim against either EPA or DOE, it should dismiss the core relief he seeks.

## CONCLUSION

For the foregoing reasons, Plaintiff's claims against EPA and DOE should be dismissed.

Dated: April 16, 2021
     Washington, DC

                              Respectfully submitted,

                              BRIAN M. BOYNTON
                              Acting Assistant Attorney General
                              Civil Division

                              CHANNING D. PHILLIPS, D.C. Bar #415793
                              Acting United States Attorney

                              BRIAN P. HUDAK
                              Acting Chief, Civil Division


                              By:  _____/s/_____

                                   SIAN JONES
                                   D.C. Bar No. 1024062
                                   Assistant United States Attorney
                                   555 4th Street, NW
                                   Washington, D.C. 20530
                                   (202) 252-2578
                                   Sian.Jones@usdoj.gov

                              CHRISTOPHER R. HALL
                              Assistant Director
                              Civil Division, Federal Programs Branch

                              By:  _____/s/_____

                                   DANIELLE YOUNG
                                   Tex. Bar No. 24098649
                                   Trial Attorney
                                   1100 L Street, NW
                                   Washington, D.C. 20005
                                   (202) 616-2035
                                   Danielle.Young2@usdoj.gov


                              *Attorneys for the United States of America*