UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEVIN CHMIELEWSKI

    Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

    Defendants.

No. 20-3025 (CJN)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Submitted by:

Jack Kolar (D.C. Bar No. 292953)
Government Accountability Project
1612 K. Street NW, Suite 1100
Washington, D.C. 20006
Telephone: (202) 457-0034

Attorneys for Plaintiff

May 25, 2021

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 3

II.    PLAINTIFF'S FACT ALLEGATIONS TAKEN FROM THE COMPLAINT AS TRUE UNDER FRCP 12(b)(6) ........................................................................ 5

   A.   First Amendment Claim Against EPA for Retaliatory Removal: ................... 5

      1.   Disclosures of Non-Travel Related Violations: .......................................... 7

      2.   Disclosure of Travel Violations: ................................................................ 8

   B.   First Amendment Claim Against DOE for Failure to Hire: ........................... 9

   C.   Due Process Claim Against EPA: ................................................................. 9

III.   FACT ALLEGATIONS FROM THE MOTION TO DISMISS THAT CANNOT BE ACCEPTED AS TRUE UNDER FRCP 12(b)(6). ........................... 10

IV.    LEGAL STANDARDS AND DEFENDANTS' CHALLENGES IN COMPLYING WITH THEM ................................................................................. 13

   A.   Defendants Correctly State the Rule 12(b)(6) Pleading Standard: ............... 13

   B.   Defendants Correctly State the First Amendment Public Employee Balancing Test and Duty Speech Standards: ................................................................. 14

   C.   Defendants Consistently Misapply the Pleading Standard to the First Amendment Standards ................................................................................... 14

   D.   Defendants Fail to Properly Apply Due Process Standards: ........................ 16

   E.   The Justiciability and Political Affiliation Standards Argued by Defendants Should be Applied at the FRCP 12(b)(6) Stage ........................................... 17

V.     CONCLUSION .................................................................................................... 20

## I. INTRODUCTION

1. Plaintiff alleges that the U.S. Environmental Protection Agency ("EPA") and the Department of Energy ("DOE") violated his free speech and due process rights by, respectively, removing him and refusing to hire him. The EPA fired him from his 5 U.S.C. § 3132(a)(7) non-career Senior Executive Service ("SES") position on February 12, 2018. The DOE refused to hire him into a GS-15 non-career political appointee position.

Despite the Defendants' recasting of Plaintiff's Complaint as concerning only travel abuses disclosed prior to his termination, and only disclosed pursuant to his duties, in paragraph 1 and other paragraphs of his Complaint, Plaintiff clearly alleges that his protected disclosures about both travel misconduct and non-travel flagrant corrupt practices were made *before* he was terminated, in a letter received on April 20, 2018:

> [H]e *was removed* for retaliatory reasons and without due process of law *because he engaged in a series of allegations to appropriate officials, human resources staff, agency counsel, and Congressional committees* that the Administrator was engaged in a pattern and practice of incurring travel expenses, *office improvements, and use of staff for personal tasks* in violation of federal statutes, regulations and… EPA policies.

(Emphasis added). Nor does the Complaint characterize Plaintiff's ordinary duties as including oversight or regulation of the EPA Administrator's travel practices. The Defendants cite only to incidental actions in paragraphs 24-25 of the Complaint to draw only unfavorable inferences therefrom that policing travel was among Plaintiff's ordinary duties.

*Opposition to Motion to Dismiss*     3

Despite the Defendants' assertion that the Complaint fails to allege his disclosures were made as a citizen, a fair reading and favorable inferences of the following paragraphs of the Complaint are to the contrary:

> 55. Plaintiff did not agree explicitly or implicitly to waive, surrender or refrain from exercising his First Amendment rights by reason of accepting employment at the EPA. In accepting his positions, he intended to fully retain his rights *to speak as a citizen addressing matters of public concern.*
>
> 56. *All of Plaintiff's disclosures* set forth above addressed *matters of public concern*.

(Emphasis added). Furthermore, under *Pickering* balancing, the Complaint alleges that Plaintiff's travel and non-travel disclosures did not impact the agency mission or his low-level duties with a big title:

> 1. From May 2017 until February 12, 2018, Plaintiff served as Deputy Chief of Staff for Operations at the EPA under Administrator Scott Pruitt (hereafter "Administrator") *performing predominantly administrative and ministerial functions*.
>
> 54. Plaintiff's disclosures of the Administrator's non-compliance with expense, budgetary, personnel use, record keeping, and email policies, rules and regulations neither impeded Plaintiff's proper performance of his duties, *nor interfered with the regular operations* of the Administrator's office or the performance of the Administrator's duties.
>
> 59. The Administrator, the EPA and the United States had no legitimate governmental interest in removing or otherwise involuntarily terminating Plaintiff from his employment.

As to the DOE post-removal failure to hire First Amendment claim, Plaintiff clearly alleged he had been unable to find work in his field since his unlawful termination, until the DOE on March 31, 2020 informed him that he would be hired. Retaliation quickly followed, for on April 8, 2020, the White House Presidential Personnel Office informed Plaintiff that there would be no place for him in the

*Opposition to Motion to Dismiss*　　　　4

Trump Administration due to his protected activity. Defendants' offer little First Amendment analysis for this claim against DOE, but instead assert that the judiciary should not grant equitable job relief against the United States government regardless of the constitutional offenses, if political control of the White House has changed in the interim. Because Defendants elected to move only against the sufficiency of the bare Complaint under FRCP 12(b)(6), limiting themselves to the fact allegations therein, no record is before the Court indicating that the current EPA and DOE would not welcome or accept Plaintiff to reinstatement or instatement. Had Defendants instead elected to file their own fact allegations in an answer (or answer with exhibits) in which they could allege that there is no job for Plaintiff and/or that all Trump non-career employees had been removed, they could have then filed a motion for judgment on the pleadings under FRCP 12(c) containing such allegations. But as things stand, there is no record before the Court defeating the justiciability or viability of the requested equitable relief.

## II.  PLAINTIFF'S FACT ALLEGATIONS TAKEN FROM THE COMPLAINT AS TRUE UNDER FRCP 12(b)(6)

Rather than rely upon Defendants' culling of fact segments and phrases from the Complaint more likeable to them, the following verbatim paragraphs should better serve the Court's FRCP 12(b)(6) analysis.  These paragraphs have been reorganized to more conveniently present Plaintiff's rebuttal to the manner in which Defendants recast the Complaint.

### A. First Amendment Claim Against EPA for Retaliatory Removal:

52.  In January 2018, ***  Jackson and Munoz told Plaintiff to *cease his oversight of the Administrator* and that they would try to find him a placement elsewhere.

*Opposition to Motion to Dismiss*              5

13. On February 12, 2018, the EPA informed Plaintiff that if he did not resign, he would be fired, and was on that date ordered to return his office access authorizations and to leave the worksite.

53. *Oversight of the Administrator's* compliance with expense, budgetary, personnel use, record keeping, and email policies, rules and regulations was not a duty assigned to Plaintiff, and was not a part of his job description.

39. On February 12, 2018 Plaintiff was stripped of his access authorization and removed from the building. However, Plaintiff initially continued to get paid while having no assignments. At no time was Plaintiff informed he had been removed, fired or otherwise involuntarily terminated.

40. Within two weeks [by February 26, 2018], Helena Wooden-Aguilar and Justina Fugh told Plaintiff that the EPA General Counsel's office warned the Administrator's Chief of Staff Ryan Jackson not to make statements to the effect that Plaintiff was removed because he went to Congress, Human Resources or other officials. They informed Plaintiff they did not have any paperwork showing his removal.

33. Plaintiff met with staff of the House Oversight and Government Reform Committee on approximately April 12, 2018 to provide detailed information about his disclosures.

1. *** [I]n a letter dated April 12, 2018, and mailed on April 16, 201[8], the EPA represented to Plaintiff for the first time that he was considered to have resigned on March 17, 2018 despite Plaintiff having never resigned.

41. On April 20, 2018, Plaintiff received personnel documents falsely representing that he had resigned on March 17, 2018. Munoz had signed said documents "*for Kevin Chmielewski*" and dated the resignation as March 17, 2018. Munoz also signed the "Employee Mobile Device Acknowledgement Form" as "*For Kevin C.*" on March 17, 2018. Jackson signed follow-up documents to the same effect "*for Scott Pruitt*" on April 5, 2018.

57. The Administrator and his senior staff including Ryan Jackson, Chief of Staff to EPA Administrator, Charles Munoz, White House Liaison for EPA, and Pasquale Perrotta, Chief of Security for the Administrator, and the White House Office of Management and Budget had knowledge of Plaintiff's disclosures.

58. The Administrator removed or otherwise involuntarily terminated the Plaintiff's employment because of his disclosures.

34. Following his termination, Plaintiff engaged in protected disclosure to the news media explaining many of the foregoing disclosures and alleged that Administrator Pruitt had lied to Congress regarding them.

1. ***Disclosures of Non-Travel Related Violations:***

The following disclosures alleged in the Complaint are almost completely passed over by Defendants due to their preference for the most unfavorable inference that these disclosures were made after Plaintiff's removal.  Those unfavorable inferences also rely on ignoring that Plaintiff was not informed that he was terminated until after his meeting with Congressional staff on April 12, 2018.

> 26.  The Administrator used five email addresses, three EPA official email addresses and two private email addresses to conduct official EPA business. He violated policies and laws prohibiting the conducting of official business over non-official email accounts thus avoiding FOIA requests.
>
> 27.  The Administrator used Millan Hupp as a personal real estate representative, having her spend weeks improperly using federal government resources and time to contact rental and seller's agents, and touring numerous properties in which the Administrator might wish to reside.
>
> 28.  The Administrator used government funds to pay $3,000 for civilians to conduct a bug sweep of the EPA, a federal building. It is a violation of law for a civilian to conduct a sweep of a federal building.
>
> 29.  The Administrator installed a $43,000 secure communications facility ("phone booth") next to his office, despite the already existing secure communications facility on another floor of the EPA building.
>
> 30.  In violation of 5 CFR § 410.502 the Administrator paid security detail overtime, using their services on Saturdays and Sundays so they could acquire expensive face cream for him, to be purchased at the Ritz- Carlton in Baltimore, Maryland. The Administrator also used this security detail to pick up his dry cleaning and run other errands.
>
> 31.  The Administrator rented a condominium from the head of Williams & Jensen lobbying firm which had business before the EPA. One of the firm's clients in 2017 was Cheniere Energy Inc., which owned an active liquefied natural gas ("LNG") export plan at the time, a matter of regulatory concern to the EPA.

*Opposition to Motion to Dismiss*           7

32. Plaintiff was present in meetings with Ryan Jackson and Millan Hupp from about May 2017 to February 2018 when they verbalized that they were removing from the "secret calendar" meetings the Administrator had with coal, mining, oil industry, fertilizer businessmen/lobbyists (mostly from Oklahoma) and changed calendar entries to "staff meeting" for the public calendar record. EPA staff were directed to falsify the Administrator's official schedules after the meetings took place so the public and the EPA would not know of meetings with lobbyists.

2. *Disclosure of Travel Violations:*

Defendants ask the Court to conclude that all of the following disclosures of travel violations constitute non-actionable duty speech based on the unfavorable inference that all of these unholy travel logistics, including those organized by other staff members and/or lobbyists and/or by the Administrator himself, fell within Plaintiff's job purview, despite the Complaint not alleging that.

23. The Administrator spent more than $120,000 of public funds during a June 2017 trip to Italy *that an EPA lobbyist organized* under the guise of a meeting with environmental ministers from G-7 countries. This trip included a $30,500 security detail, and nearly $90,000 spent on food, hotels, commercial airfare, and an $11,000 military jet used by the Administrator and nine of his staffers. The EPA paid this $11,000 for a military aircraft to fly the Administrator and his staff from Cincinnati to New York for said trip to Italy despite the availability of commercial flights that were faster and cheaper.

22. The Administrator flew back and forth to Oklahoma many weekends, often at the EPA's expense, in violation of the rules and policies. In the spring and summer of 2017, he spent 43 days over a 3-month time-period traveling to Oklahoma. To circumvent the rules and avoid paying for trips home himself, the Administrator *had his staff create a meeting in Oklahoma* during his stay to justify his planned personal travel.

25. *** The Administrator had himself issued a "blanket waiver" to the federal regulation limiting officials' ability to fly first-class. The Administrator would stay in among the most expensive hotels in violation of the travel policies and regulations. His travel often exceeded the prescribed 150% per diem rate without appropriate justification and approval.

### B. First Amendment Claim Against DOE for Failure to Hire:

The following paragraphs of the Complaint clearly allege a First Amendment failure to hire by the DOE.

>   43.  On April 8, 2020 John McEntee and Jared Smith called Plaintiff from the White House and informed him that every time they tried to pass his paperwork through, it was stopped by numerous people because of what happened at the EPA with Scott Pruitt due to Plaintiff's disclosures.
>
>   44.  Plaintiff then texted Mr. Smith and asked if he or Mr. McEntee could speak when they were away from the White House and could talk freely. Mr. Smith sent Plaintiff a texted response that "the Admin[istration] isn't a possibility but I'll try and help you and will call you this weekend."
>
>   45.  Plaintiff received no more communications from the DOE and was not hired into the position he was told he would receive.
>
>   60.  Plaintiff was qualified for the DOE position for which he was interviewed and told to shortly expect an appointment thereto.
>
>   61.  On information and belief, DOE officials were aware of Plaintiff's protected activity, including through extensive media coverage of the same.
>
>   62.  Plaintiff was not hired into the DOE position in retaliation for his protected activity in violation of his speech rights under the First Amendment.

### C. Due Process Claim Against EPA:

The Complaint clearly alleges that Plaintiff had a property interest in his EPA job because federal regulations gave him the unequivocal expectation of continue employment unless and until he received the required notice of termination of that expectation.

>   64.  Plaintiff was employed at the Department of Homeland Security at the time he accepted a position at the EPA as a career level GS-14 Director of Scheduling on April 25, 2017. He had a constitutionally protected expectation of continued employment and property interest in that civil service position.

65. The Office of Personnel Management regulations confer upon SES non-career appointees a right to notice prior to removal. 5 CFR § 359.902 "Conditions of Removal" render the agency's right to remove an appointee contingent upon notice prior to the date of removal. This regulation established Plaintiff's expectation of pre-removal notice.

66. Instead of providing Plaintiff with the required prior notice, the Administrator, Munoz and Jackson affirmatively concealed the removal from Plaintiff by creating false documentation of a resignation he had not submitted.

### III. FACT ALLEGATIONS FROM THE MOTION TO DISMISS THAT CANNOT BE ACCEPTED AS TRUE UNDER FRCP 12(b)(6).

In their Motion to Dismiss ("MTD"), Defendants assert the following as facts in the record, or as *negative inferences* therefrom. These excerpted fact allegations are quoted verbatim, and the italicized terms emphasize the most material allegations not contained in the Complaint or record:

1. [Plaintiff and the Administrator previously had] a *close* working relationship (MTD p. 1).

2. *Following his separation from EPA*, Plaintiff met with Congressional staffers (MTD p. 1).[1]

3. Plaintiff was a *policy-level* employee (MTD p. 2).

4. [I]t was permissible for EPA to remove him *for opposing the Administrator's policy decisions*. (MTD p. 2).[2]

---

[1] Plaintiff was not removed from the EPA on February 12, 2018, but only had his access authorization and parking pass taken from him. He was still being paid. Not until April 20, 2018, did he receive the notification dated April 12, but sent on April 16, that he allegedly had been removed as of March 16. Thus, the April 16 removal notification, back-dated to April 12, was the same day as his Congressional meeting. The Complaint fairly infers, as does common knowledge, that Plaintiff had communications with Congressional staff before he was given the actual meeting. *See also*, para. 40 referencing his Congressional contacts as early as late February 2018.

[2] Corrupt misappropriation of government budgetary funds does not constitute a governmental "policy decision". The Complaint fairly shows that Plaintiff opposed corruption, not policy decisions.

5.  DOE would still have been within its rights in declining to hire him for his speech because of the *policy nature of the political appointment he sought*. (MTD p. 2)

6.  The Complaint does not specify what "disclosures" were made *during his EPA tenure*, other than the specific objection he made to the Administrator regarding travel (MTD p. 3, n. 3).[3]

7.  Plaintiff made *no other disclosures prior to his separation from EPA on February 12, 2018*, although he had knowledge of other improper activities by the Administrator. (MTD p. 4).[4]

8.  *After his separation* from EPA, Plaintiff met with staffers from the House Oversight and Government Reform Committee (MTD p. 4).[5]

9.  [Plaintiff was] a policy-level employee *opposing the policies of his superiors*. (MTD p. 6).

10.  [Plaintiff] spoke not as a private citizen in addressing matters of public concern, but as an employee *pursuant to his official duties*.[6]

---

[3] As set forth above, the Complaint alleges that except for his media contacts, all of Plaintiff's disclosures were made before April 20, 2018, and that it was all of these disclosures that led to his removal from the EPA. As set forth above, para. 40 of the Complaint alleges:

> 40.  Within two weeks [by February 26, 2018], Helena Wooden-Aguilar and Justina Fugh told Plaintiff that the EPA General Counsel's office warned the Administrator's Chief of Staff Ryan Jackson not to make statements to the effect that Plaintiff was removed *because he went to Congress, Human Resources or other officials*. They informed Plaintiff they did not have any paperwork showing his removal.

(Emphasis added). Helena Wooden-Aguilar was the Deputy Associate Administrator for the Office of Policy, and Justina Fugh was Senior Counsel for Ethics.

[4] See notes 1 and 3 above as to the incorrectness of this alleged timing.

[5] See note 3 above as to the incorrectness of this alleged timing.

[6] Para. 53 above clearly states that most of Plaintiff's disclosures were not pursuant to his duties:

*Opposition to Motion to Dismiss*         11

11. [Plaintiff's] *policy disagreement* with the Administrator involved matters within *the core of his responsibilities* such that the Administrator could no longer expect him to carry out his *policy choices* effectively. (MTD p. 14).

12. Plaintiff felt that he *could not perform* those job duties because of his disagreement with the Administrator (MTD p. 17).[7]

13. [T]he Administrator [is] whom he *worked for directly*. (MTD p. 18).

14. Plaintiff's work had *clear policy implications* and thus relates to a *policy area*. (MTD p. 20).

15. Plaintiff was responsible for arranging travel in a manner that *advanced the "implementation of the [Administrator's] broad goals"* for the agency. (MTD p. 20).

16. [Plaintiff] refused to perform his job responsibilities because of that *policy disagreement*.(MTD p. 21).[8]

17. [Plaintiff] was no longer a compatible political deputy who could be counted on by former Administrator Pruitt *to advance EPA's organizational objectives*. (MTD p. 21).

18. The positions he sought at DOE *were policy-level* positions. (MTD p. 21).

19. [I]t would therefore be reasonable for DOE to conclude he was not likely to be a *compatible* political deputy who could be counted on by

---

53. *Oversight of the Administrator's* compliance with expense, budgetary, personnel use, record keeping, and email policies, rules and regulations was not a duty assigned to Plaintiff, and was not a part of his job description.

As to travel, other than making travel arrangements and having some sign-off or co-sign-off duties, nothing in the record suggests that Plaintiff had any policing function over the travel, nor that his research into the travel regulations was part of his job duties.

[7] The Complaint does not allege Plaintiff could not perform any job duty, the Defendants are speculating that his duty was to sign and acquiesce to corrupt travel practices, and that by not signing he therefore "could not perform" the "duty" to sign-off on fraud.
[8] Refusing to sign-off on corruption is not a "policy disagreement".

*Opposition to Motion to Dismiss*        12

his would-be DOE superiors *to advance DOE's organizational objectives*. (MTD p. 21).

20. That [DOE] role, which would have included *implementing decisions about the timing and location* of travel for the Secretary or Deputy Secretary and *representing such high-level officials in meetings with* other government agencies, *Congress*, and non-governmental entities, would have had *clear policy implications*. (MTD p. 22).[9]

21. Plaintiff's prior speech—in particular, his negative comments to news media outlets—*suggested that he might directly interfere with that interest* (MTD p. 22-23).

22. [Plaintiff's oath of] Loyalty to President Trump" *** could rightly be [of] concern [to the DOE] about whether he would "*carry out their policy choices vigorously*." (MTD p. 25).[10]

### IV. LEGAL STANDARDS AND DEFENDANTS' CHALLENGES IN COMPLYING WITH THEM

**A. <u>Defendants Correctly State the Rule 12(b)(6) Pleading Standard:</u>**

Defendants accurately set forth the FRCP 12(b)(6) standard that this Court must apply in adjudicating their Motion to Dismiss.[11] But as Section III above makes plain, Defendants exhibit considerable difficult in abiding that standard as to accepting the Complaint's stated allegations as true, and additionally in giving favorable fact inferences to what is expressly stated.

---

[9] Plaintiff has no means to even know the source of these allegations, but they are not from the Complaint or record.

[10] The only functions the Complaint alleges Plaintiff would not carry out vigorously are corruption functions.

[11] *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000)

### B. Defendants Correctly State the First Amendment Public Employee Balancing Test and Duty Speech Standards:

Defendants also set forth the correct First Amendment standards under the *Pickering*[12] balancing test for weighing the *competing interests* of employee speech against the need for government efficiency. Defendants likewise recite the correct *Garcetti*[13] standard for discounting employee speech that is compelled, paid for or made pursuant to the employee's actually *assigned* and *ordinary* job duties.

### C. Defendants Consistently Misapply the Pleading Standard to the First Amendment Standards

However, Defendants fall far short in correctly applying the Rule 12(b)(6) pleading standard to the *Pickering* and *Garcetti* First Amendment standards. This is readily apparent in the Defendants' unrelenting efforts, if not insistence, to recast the fact allegations of the Complaint, elaborate unfavorable fact inferences, and assert fact allegations and inferences that find no support in the Complaint applying the FRCP 12(b)(6) lens. First, Defendants attempt to rewrite the Complaint as being (a) limited to nothing other than "disagreements" over travel rules, (b) an artificial February 12, 2018 end date on disclosures and causation despite the doctored notice of removal dated April 16 and backdated to the date of Plaintiff's Congressional meeting, (c) disregarding Plaintiff's allegations in para. 40 of his communication with the Ethics and Policy offices regarding Congressional, Human Resources and White House executives, and (d) the para. 53 allegation that overseeing compliance

---

[12] *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968).

[13] *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

*Opposition to Motion to Dismiss*       14

with expense, budgetary, personnel use, record keeping, and email policies, rules and regulations was not a duty assigned to Plaintiff.

Second, in straining to meet the *Pickering* and *Garcetti* standards, Defendants try to burden the record with nowhere to be found therein assertions the Administrator's corrupt practices were in furtherance of high policy goals, competing policy deliberations, job duties if not job descriptions, all bound up in the supposed necessity of the Administrator having trust and confidence that Plaintiff would not disclose but conceal these practices from the Ethics and Policy offices, HR, Congress and the White House.

The most persuasive authority for this Court in adjudicating the Motion to Dismiss is that First Amendment public employee cases are almost never disposed of under FRCP 12(b)(6). Indeed, of the numerous cases cited by Defendants, *Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) is the only one dismissed under Rule 12(b)(6). That was possible only because the Complaint was so clear that Plaintiff was the top administrator of the athletic department and his speech concerned only the management of that department. All of the other cases cited by Defendants were decided after trial, on summary judgment, or on motion for judgment on the pleadings.[14]

---

[14] Furthermore, only *Mpoy v. Rhee*, 758 F.3d 285 (D.C. Cir. 2014) was decided by judgment on the pleadings, which was made possible only because the sole protected activity was a five page email he wrote appeared in the record verbatim, of which only "a single sentence consisting of 2.5 lines in a 160-line email; 16 words out of more than 1300" was even arguably protected by the First Amendment.

### D. **Defendants Fail to Properly Apply Due Process Standards:**

Defendants correctly *state* the generalized *Roth*[15] due process standard as to a public employee needing to demonstrate a property interest in his job in order to be entitled to any constitutional process protections over the expectation of continued employment. However, Defendants omit the D.C. Circuit precedents holding that a published rule or regulation not subject to the discretion of the terminating official can alone create a protected expectation if it conditions or limits the otherwise purely at will nature of the continued employment.[16]

5 CFR § 359.902 "Conditions of Removal" is just such a regulation, but Defendants brush it off as meaningless, contravening the rule of construction that every statute and regulation is to be construed as having meaning, force and effect.[17] Defendants argue that subsection (a) allows that appointees "may" be removed "at any time", but ignore the condition of removal that it be "subject to this subpart". Subsection (b) unequivocally states that: "The agency *shall* notify the appointee in writing *before the effective date* of the removal." Here the Administrator through his

---

[15] *Bd. of Regents v. Roth,* 408 U.S. 564, (1972).

[16] *Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2015), stating: "Like statutes, regulations may create protected property interests. *Bloch v. Powell*, 348 F.3d 1060, 1068-69, 358 U.S. App. D.C. 322 (D.C. Cir. 2003). Property flows from a regulation only when the regulation limits discretion such that a particular outcome must follow when substantive predicates are met. *Id*. at 1069 (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989))."

[17] See, Nat'l Ass'n of Mfrs. v. Dept of Defense, 138 S. Ct. 617, 632 (2018) (courts should "give effect, if possible, to every word Congress used.")

operatives gave no notice until purportedly after the removal. Para. 66 is accepted as true:

> 66. Instead of providing Plaintiff with the required prior notice, the Administrator, Munoz and Jackson affirmatively concealed the removal from Plaintiff by creating false documentation of a resignation he had not submitted.

In view of that corruption especially, this Court should not adjudicate dispositively the effect of 5 CFR § 359.902 under FRCP 12(b)(6).[18]

### E. The Justiciability and Political Affiliation Standards Argued by Defendants Should be Applied at the FRCP 12(b)(6) Stage

Defendants are correct that American political tradition is that most political appointees resign upon changes of administration, and that if they fail to do so, they can be terminated if the agency doesn't want to keep them.[19] However, numerous political appointees are retained. Defendants citation to Tripp is especially apt since the Court can take judicial notice that she served in the Clinton White House and later the Pentagon precisely because she was allowed to keep her Bush I political appointment.[20]

Defendants are correct that this case presents an issue of first impression as to the equitable relief of reinstating Plaintiff to the EPA or instating him to the DOE.

---

[18] Plaintiff concedes that while he did have a due process right in continued health insurance, the time limitations for that benefit have long since expired, and there is no plausible relief he can demand at this stage.

[19] *Tripp v. Dep't of Def.*, 193 F. Supp. 2d 229 (D.D.C. 2002).

[20] Wikipedia FN 1 *Gates, Anita; Seelye, Katharine Q. (April 8, 2020). "Linda Tripp, Key Figure in Clinton Impeachment, Dies". The New York Times* ("She had worked in the White House under President George H.W. Bush and stayed on to work briefly in the Clinton administration. She was transferred to the Pentagon and its public affairs office.)

However, there is no question that this Court has the power to grant the purely equitable relief of reinstatement. *Hubbard v. EPA*, 809 F.2d 1 (D.C. Cir.1986).[21]

Party affiliation has been a matter of deep constitutional concern to the Supreme Court for decades, and has been regarded as a potential constitutional threat. See, *Branti v. Finkel*, 445 U.S. 507 (1980) (The Court determined that the assistants' party affiliation was not an appropriate requirement for the effective performance of their duties);[22] and *Elrod v. Burns*, 427 U.S. 347 (1976) (patronage dismissals severely restricted political belief and association, were unconstitutional

---

[21] The court in *Hubbard* held:

> In particular, this Circuit has recognized the right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general, *Bartel v. FAA*, 223 U.S. App. D.C. 297, 725 F.2d 1403, 1415 (D.C. Cir. 1984), and his first amendment rights in particular, *Reuber v. United States*, 750 F.2d at 1061; *Id.* at 1065-68 (Bork, J., concurring); *Williams v. IRS*, 745 F.2d at 705. Reinstatement clearly is among those equitable remedies available to Hubbard.

This equitable power to vindicate constitutional wrongs applies to any at will non-CSRA position, including political appointees.

[22] The Court stated:

> "The Court recognized in United Public Workers v. Mitchell, 330 U.S. 75, 100 (1947), that 'Congress may not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office. . . ."' This principle was reaffirmed in *Wieman v. Updegraff*, 344 U.S. 183 (1952), which held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. And in *Cafeteria Workers v. McElroy*, 367 U.S. 886, 898 (1961), the Court recognized again that the government could not deny employment because of previous membership in a particular party." Id., at 357-358.

*Branti at* 445 U.S. 507, 515 n.10.

***Opposition to Motion to Dismiss***      **18**

under the First and Fourteenth Amendments, and that respondents stated a valid claim for relief.) A critical component in the analysis has been the position of the public employer, and the needs and justifications it offers to validate not retaining or hiring employees of a different political party. Yet, on a FRCP 12(b)(6) motion this Court has nothing in the record as to the positions of the EPA and DOE on whether they would object to reinstatement of a corruption fighting whistleblower like Plaintiff. Nor does the Court have any record before it as to whether either agency has retained any Trump political appointments who were not asked to resign, or who were not removed if they declined. More development of the record should be allowed before this Court disposes of such a monumental question of first impression, and being asked solely because of constitutional wrongs committed against Plaintiff in response to his corruption fighting efforts.[23]

---

[23] FRCP 56 would be the most appropriate vehicle to develop such a record. But at minimum, an FRCP 12(c) motion for judgment on the pleadings would be appropriate after the EPA and DOE file answers stating their objections or positions on reinstatement, perhaps with exhibits. As explained in Wright & Miller, 5C Federal Practice & Procedure §1367 (3d ed. 2015):

> The motion for judgment on the pleadings under Federal Rule 12(c) has its historical roots in common law practice, which permitted either party, at any point in the proceeding, to demur to his opponent's pleading and secure a dismissal or final judgment on the basis of the pleadings. The common law demurrer could be used to search the record and raise procedural defects, or it could be employed to resolve the substantive merits of the controversy as disclosed on the face of the pleadings. In contrast to the common law practice, the Rule 12(c) judgment on the pleadings procedure primarily is addressed to the latter function of *disposing of cases on the basis of the underlying substantive merits of the parties' claims and defenses* as they are revealed in the formal pleadings.

(Emphasis added).

*Opposition to Motion to Dismiss*      19

## V.  CONCLUSION

The Defendants' Motion to Dismiss should be denied, and the record should be more factually developed before any dispositive orders are entered in this case.

Respectfully Submitted,

/s/ Jack Kolar

_____
Jack Kolar (D.C. Bar No. 292953)
Attorneys for Plaintiff