UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEVIN CHMIELEWSKI,<br><br>*Plaintiff,*<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY,<br>ADMINISTRATOR OF EPA, DEPARTMENT<br>OF ENERGY, SECRETARY<br>OF ENERGY<br><br>*Defendants.* | CASE NO. No. 20-3025 (CJN) |

FIRST AMENDED COMPLAINT
FOR EQUITABLE RELIEF

Plaintiff Kevin Chmielewski, by and through his attorneys, brings this action

under the First and Fifth Amendments of the U.S. Constitution against the

Environmental Protection Agency, the Department of Energy and the highest

government officials of each, and pleads as follows as this amended complaint:

## I.  NATURE OF THE ACTION

1.     Plaintiff alleges that the U.S. Environmental Protection Agency ("EPA"),

the Department of Energy ("DOE") violated his first amendment free speech and fifth

amendment due process rights. On February 12, 2018, the EPA involuntarily excluded

Plaintiff from the worksite where he was performing as a 5 U.S.C. § 3132(a)(7) non-

career Senior Executive Service ("SES") employee.  He received letter notice

postmarked April 16, 2018 falsely claiming he had resigned as of March 17, 2018. On April 8, 2020, the DOE refused to hire him into a GS-15 non-career political appointee position. These actions were taken for retaliatory purposes and without due process of law.

2.　From July 16, 2017 until February 12, 2018, Plaintiff served as Deputy Chief of Staff for Operations at the EPA under Administrator Scott Pruitt (hereafter "Administrator") performing predominantly administrative and ministerial functions.

3.　Plaintiff had been unable to find work in his field since his unlawful exclusion from the workplace, until March 31, 2020, when the DOE informed him that he would be hired with the assistance of the White House Office of Presidential Personnel (OPP).

4.　However, on April 8, 2020, the White House Office of Presidential Personnel informed Plaintiff that there would be no new employment for him in the Trump Administration due to his protected activity.

## II. JURISDICTION AND VENUE

5.　This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because Plaintiff's cause of action arises under the Constitution and laws of the United States and raises Federal questions under the free speech clause of the First Amendment and the due process clause of the Fifth Amendment.

6.　Plaintiff has exhausted his administrative remedies with the Office of Special Counsel (OSC) and the Merit Systems Protection Board (MSPB).  On January 16, 2020, the OSC found it lacked jurisdiction over a non-career SES employee like

Plaintiff.  On April 20, 2020, the MSPB made the same determination. The OSC and

MSPB correctly concluded that Plaintiff has no right to any remedy as a non-career SES

employee under the Civil Service Reform Act (CSRA), 5 U.S.C. §7701 et seq, or the

Whistleblower Protections Enhancement Act, 5 U.S. Code § 2302 et seq. On October 16,

2020, the OSC made the same determination as to the DOE's retaliatory refusal to hire

him.

      7.      Sovereign immunity for non-monetary relief has been waived by 5 U.S.C.

§ 702 of the Administrative Procedures Act.

      8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and

(e).

### III.  PARTIES AND KEY ACTORS

      9.      Plaintiff is a citizen of the United States and now resides in the State of

Delaware. During times material to this action, Plaintiff worked in the EPA's

Washington, DC office.

      10.      Defendant Environmental Protection Agency and Department of Energy

are agencies of the United States under 5 U.S.C. § 104, and within the meaning of 5

U.S.C. § 701. The principal offices of each are in the District of Columbia.

      11.      In addition to the former Administrator, Scott Pruitt, EPA officials who

were actors in the events set forth herein are as follows:

    (a)  Ryan Jackson, Chief of Staff to EPA Administrator Pruitt;

    (b)  Charles Munoz, White House Liaison for EPA;

    (c)  Millan Hupp, Secretary of Scheduling for Administrator Pruitt;

    (d)  Pasquale "Nino" Perrotta, Chief of Security for Administrator Pruitt;

    (e)  Samantha Dravis, Associate Administrator for EPA Office of Policy;

    (f)  Justina Fugh, Esq. EPA Senior Counsel for Ethics; and

    (g)  Helena Wooden-Aguilar, Esq., EPA Deputy Associate Administrator for the Office of Policy.

12.  In addition to the Secretary, DOE officials who were actors in the events set forth herein are as follows:

    (a)  Jonathan Wetzel, White House Liaison to Department of Energy;

    (b)  Coleman Tolbert, Special Assistant at the Office of the White House Liaison to the U.S. Department of Energy; and

    (c)  Sophia Varnasidis, Chief of Staff of the Deputy Secretary of the Department of Energy.

## IV.  BACKGROUND FACTS

13.    Plaintiff is a U.S. Coast Guard veteran and held a Merchant Marine Captain's license for sixteen years. From approximately 2002, he was regularly employed by various political organizations and campaigns as an "advance man" for scheduling and security logistics during travel, all non-policy positions performing logistical tasks.

14.    In mid-2014 at age 34, Plaintiff performed such duties for the Trump organization in New York. Following Mr. Trump's 2016 election to the Presidency, Plaintiff was employed by the Presidential Inauguration Committee. Once the Trump Administration assumed office, he was hired to perform travel logistics duties at the Department of Homeland Security. Plaintiff had no education or experience in the policy issues delegated by Congress to DHS.

15.    On or about April 25, 2017, Plaintiff began a position at the EPA as a GS-14 Director of Scheduling.

16.     On July 2, 2017, Plaintiff accepted a position as the Administrator's Deputy Chief of Staff for Operations, a non-career Senior Executive Service ("SES") post with duties limited to trip planning and scheduling. Plaintiff was not assigned duties to enforce travel rules and regulations, nor to report violations to enforcement officials. Plaintiff did not participate in environmental science, policy, or law work, or in any other policy, law, or science activities Congress delegated to the EPA.

17.     Throughout the period from the latter part of 2017 to February 12, 2018, Plaintiff disclosed to various individuals and officials within the EPA and at the White House what he perceived to be illegal and unethical actions undertaken by Administrator, as more specifically alleged below.

18.     When Plaintiff arrived at his office on the morning of Monday, February 12, 2018, he found that the lock to his office was changed so that he was unable to enter with his old key.  Plaintiff was told that he would either be reassigned or needed to resign or be fired.  Following that, he was ordered to return his office access authorizations and to leave the worksite. He was then escorted out of the EPA building by two armed security officers.

19.     On February 13, 2017, despite having been escorted from the EPA workplace, Plaintiff was assigned by the Vice President's staff to provide logistical support to an upcoming trip by the Vice President and his staff.

20.     On or about February 20, 2018, eight days after Plaintiff was excluded from his workplace at EPA, Plaintiff provided such logistical support before and during the Vice President's trip to Cape Canaveral, Florida.

21.     Approximately two weeks after Plaintiff's exclusion, EPA Deputy
Associate Administrator for the Office of Policy Helena Wooden-Aguilar and EPA senior
counsel for ethics Justina Fugh, told Plaintiff that the EPA General Counsel's office
warned the Administrator's Chief of Staff Ryan Jackson not to make statements to the
effect that Plaintiff was removed because he went to Congress, Human Resources or
other officials.  Wooden-Aguilar and Fugh also informed Plaintiff they did not have any
paperwork showing his removal. On information and belief, government officials
published press accounts representing that Plaintiff was on administrative leave as late as
April 6, 2018.

22.     For several pay periods after his exclusion from the EPA building,
including for the period he was with Vice President Pence on official travel, Plaintiff
continued to receive his Federal pay checks and benefits. Plaintiff continued to receive
payments through May 4, 2018. This was consistent with Plaintiff's understanding that,
although he was still a Federal employee being paid by the EPA, he was being prevented
by Mr. Pruitt, his Chief of Staff Ryan Jackson, and Mr. Munoz from performing his
services as EPA Deputy Chief of Staff.

23.     On March 13, 2020, John McEntee II, OPP Director and his deputy Jed
Smith called Plaintiff expressing empathy for what happened to him and that they wanted
to get him back into the Administration.  They said they had two jobs in mind that were
GS-15 level positions at the Department of Treasury and the DOE. John McEntee
recommended the DOE travel logistics job.

24.     On March 16, 2020, Jared Smith followed up with Plaintiff via text and
phone call and advised him to call Andrew Kloster in the White House Presidential

Personnel Office. On March 18, Emily Higgins (Deputy Associate Director of the White House Presidential Personnel Office) emailed Plaintiff requesting an updated copy of his resume. On March 19, 2020, Ms. Higgins sent Plaintiff a SKC-SES Bio Sheet and an Updated Research Questionnaire for Loyalty to President Trump. This correspondence was also sent to the White House Liaison to DOE Jonathan Wetzel.

25.     On March 20, 2020, Coleman Tolbert (Special Assistant at the Office of the White House Liaison to the DOE) contacted Plaintiff to schedule an interview with Mr. Wetzel on Monday March 23, 2020, at 1:00 P.M. On March 23, 2020 Plaintiff had a WebEx interview with Mr. Wetzel. During the interview, Mr. Wetzel advised Plaintiff that he was a shoo-in for the job and that, for protocol reasons, he would have to do one more interview with the Chief of Staff of the Deputy Secretary of the DOE, Sophia Varnasidis, as the final process. Immediately following the interview, Mr. Wetzel sent Plaintiff more paperwork to begin the hiring process.

26.     On March 31, 2020, Mr. Wetzel informed Plaintiff that his interview with Ms. Varnasidis was scheduled to take place on Thursday, April 2, 2020 via WebEx. During the interview, Ms. Varnasidis advised Plaintiff that he was highly qualified for the job and that they would like to have him be part of the team. She then told him to stand by and wait for her office and the OPP to contact him within the next 24 hours. But Plaintiff was not contacted and never received that job offer.

## V.  FACTS OF PROTECTED ACTIVITY

A.   <u>**Disclosures of Travel Related Violations of Statutes, Regulations and EPA Rules**</u>

27.     From May 2017 to April 25, 2018, Plaintiff made protected First Amendment disclosures to EPA officials within and outside his chain of command, and to White House officials, and to the media and Congress, concerning what he reasonably believed constituted violations of travel policies and Federal laws for which he had no enforcement or reporting authority related to official travel, abuse of authority, gross mismanagement, fraud and waste of government funds and resources.

28.     Under 5 U.S.C. § 5733, official travel on the part of Federal employees must be "by the most expeditious means of transportation practicable" and "commensurate with the nature and purpose of the [employee's] duties," and by no means should include personal use. The Federal Travel Regulation (FTR), issued by the U.S. General Services Administration (GSA), is codified in 41 CFR Chapters 300 through 304. The FTR implements statutory requirements and executive branch policies for travel by Federal civilian employees and others authorized to travel at the government's expense.

29.     The GSA promulgates the FTR to: (a) interpret statutory and other policy requirements in a manner that balances the need to assure that official travel is conducted in a responsible manner with the need to minimize administrative costs, and (b) communicate the resulting policies in a clear manner to Federal agencies and employees. The EPA's travel policy—Resource Management Directive System (RMDS) 2550B, *Official Travel*, applies to EPA and other Federal employees who travel using agency funds. The policy also addresses travel that nonfederal sources fund for EPA employees.

The policy states that the FTR is the first source of reference for all Federal travel. Many of Plaintiff's disclosures were subsequently confirmed in whole or in part by the EPA Office of Inspector General ("OIG").

30.    The EPA OIG identified $985,037 in travel costs associated with former Administrator Pruitt's official travel for the 10-month period from March 1, 2017, to December 31, 2017. This amount covered 40 planned trips—34 completed and six canceled—and included costs incurred by the former Administrator, his Protective Security Detail (PSD) and other staff. Of the 34 completed trips, 16 included travel to, or had stops in, Tulsa, Oklahoma—the location of the former Administrator's personal residence. The amount also covered costs for military and charter flights taken by the former Administrator.

31.    The Administrator instructed his senior staff that any flight he took must be on Delta Airlines for which he had premium status and privately owned accumulated award miles.  This was a *per se* violation of EPA rules for competitive pricing.  He flew first and business class 99 times out of 112 from May to December 2017, i.e., 86 first class, 13 business, and 12 coach flights.  This distribution of passenger classes violated EPA polices and rules.

32.    The Administrator flew back and forth to Oklahoma many weekends, often at the EPA's expense, in violation of the rules and policies.  In the spring and summer of 2017, he spent 43 days over a 3-month time-period traveling to Oklahoma. To circumvent the rules and avoid paying for trips home himself, the Administrator had his staff create a meeting in Oklahoma during his stay to justify his planned personal travel. The Federal Travel Regulations (FTR) require government employees to take the direct

or usually traveled route, absent special approved circumstances. If an indirect route is used for personal convenience, government reimbursement is limited up to the cost of travel by a direct route. The Administrator violated this rule by taking trips with stops in Tulsa, Oklahoma. He also needlessly increased expenses by creating additional travel time for his protective detail agents.

33.     The Administrator spent more than $120,000 of public funds during a June 2017 trip to Italy that an EPA lobbyist organized under the guise of a meeting with environmental ministers from G-7 countries. This trip included a $30,500 security detail, and nearly $90,000 spent on food, hotels, commercial airfare, and an $11,000 military jet used by the Administrator and nine of his staffers. The EPA paid this $11,000 for a military aircraft to fly the Administrator and his staff from Cincinnati to New York for said trip to Italy despite the availability of commercial flights that were faster and cheaper.

34.     When Plaintiff objected that travel logistics or expenditures were not allowed, the Administrator responded with words to the effect, "I don't care, I'm a Cabinet Secretary, make it happen."  Lacking any assigned job authority to take any remedial action, Plaintiff decided he had no ethical choice but to become a whistleblower and try to survive the career consequences.

35.     The Administrator also provided approval for Samantha Dravis to fly first-class on his return trip from Morocco, even though there was no legal justification for her to do. Plaintiff refused to sign paperwork after the trip because it was a violation of the FTR.  However, his refusal to sign such paperwork had no practical consequence, but only indicated his dissent.

36.     The Administrator failed to comply with Federal regulations requiring government travelers to obtain approval or authorization from their agency to use accommodations, other than coach-class transportation, when traveling on official business. The Administrator had himself issued a "blanket waiver" to the Federal regulation limiting officials' ability to fly first-class.  The Administrator would stay in among the most expensive hotels in violation of the travel policies and regulations. His travel often exceeded the prescribed 150% per diem rate without appropriate justification and approval.

37.     Prior to Plaintiff's exclusion from the EPA office on February 12, 2018, in a series of meetings, phone calls, and emails, Plaintiff disclosed to the following persons Mr. Pruitt's violations of Federal statute, rules and regulations:

(a) EPA Administrator Scott Pruitt;

(b) EPA Chief of Staff Ryan Jackson;

(c) EPA Deputy Director of Scheduling and Advance Millan Hupp;

(d) EPA head of Office of General Counsel Kevin Minoli;

(e) EPA senior counsel for ethics Justine Fugh;

(f) EPA Deputy Chief of Staff Jonathan Reeder;

(g) EPA Assistant Deputy Chief of Staff Reginald Allen;

(h) White House Liaison to the EPA Charles Munoz;

(i) Associate Director of White House Presidential Personnel Office Jennifer Locetta;

(j) Vice President Mike Pence;

(k) Chief of Staff to the Vice President, Nick Ayers;

(l) Deputy Chief of Staff to the Vice President, Jennifer Pavlik;

(m) Director of Advance to President Trump, Bobby Peede;

11

(n)  Chief of Staff to President Trump, Reinhold Richard "Reince" Priebus;

(o)  Advisors and former Campaign Managers to President Trump, Cory Lewandowski, and David Bossie;

(p)  Secretary of Interior, Ryan Zinke;

(q)  Department of Interior (DOI) Director of Advance and Scheduling, Mr. Rusty Roddy; and

(r)  DOI Chief of Staff Scott Hommel.

38.  In particular, the violations included (1) enriching himself with *Diamond* level status benefits by booking flights primarily with Delta Airlines despite instances where the flights cost taxpayers more money than other airlines; (2) flying business class or first class;  (3) ordering staff to schedule fake business meetings in Oklahoma so he could fly home most weekends for personal reasons or booked trips with stops in Tulsa, Oklahoma creating additional expenses and travel time for his protective detail; (4) spending more than $120,000 of public funds on a June 2017 trip to Italy organized by lobbyist Leonard Leo, where Mr. Pruitt  had a private tour of the Vatican, and took a pasta making class, a $30,500 security detail, and spent $90,000 on food, hotels and commercial airfare, and $11,000 military jet for Mr. Pruitt and nine EPA staffers, and visited with Cardinal Pell; (5) used Kenneth Wagner's Southwest Airlines "buddy pass" to fly for free to the closest airport that has Delta Airlines in violation of the Federal gifts rule and 5 CFR §2635.702; (6) traveled with private jets, military planes, and helicopters to travel in Colorado, Kentucky, Oklahoma, Texas, Michigan, Indiana; and Cincinnati to New York JFK airport; (7) allowing head of protective detail Nino Perrotta and security detail staff to travel first class; (8) ordering staff to approve unallowable travel expenditures of favored staff members Millan Hupp, Samantha Dravis, Lincoln Ferguson, and Sarah Greenwalt, who flew business or first-class, or traveled by Acela

trains first-class; (9) failing to comply with Federal regulations requiring government travelers to obtain approval or authorization from their agency to use accommodations, other than coach-class transportation, when traveling on official business and improperly using a "blanked waiver" to fly first class for reasons other than to accommodate a disability or special needs; and (10) staying in hotels that exceeded allowable government lodging rates.

### B.  Disclosures of Non-Travel Related Violations of Statutes, Regulations and Rules

39.     Prior to his exclusion from the EPA office on February 12, 2018, Plaintiff engaged in the following protected activity. The Administrator used five email addresses, three EPA official email addresses and two private email addresses to conduct official EPA business. He thereby violated policies and laws prohibiting the conducting of official business over nonofficial email accounts, which had the potential effect of evading the EPA's obligation to disclose otherwise disclosable documents in EPA's responses to FOIA requests.  By February 12, 2018, Plaintiff reported his concerns to Justina Fugh and Kevin Minoli. He also made disclosures to Corey Lewandowski, David Bossie, Jennifer Locetta, Charles Munoz, and Bobby Peede.

40.     The Administrator used Millan Hupp as a personal real estate representative, having her spend weeks improperly using Federal government resources and time to contact rental and seller's agents, and touring numerous properties in which the Administrator might wish to reside. Plaintiff observed this directly during April 2017-February 2018 when he saw Ms. Hupp searching online and heard her having phone conversations with realtors. In September or October of 2017, Plaintiff disclosed this to Ryan Jackson and Charles Munoz.

41.     Beginning in September 2017, Plaintiff reported within the EPA, and to the President's office, the Vice President's office, and the President's advisors his reasonable belief that Mr. Pruitt was attempting to give an unallowable pay raise to Ms. Hupp and Ms. Sarah Greenwalt; and ordered Millan Hupp to use her Federal government time to serve as his personal real estate agent in a manner that violated Federal laws, rules, and regulations.

42.     Mr. Pruitt attempted to promote and pay Milan Hupp a salary that exceeded a rate to which she was entitled pursuant to her qualifications. In January 2018, when Plaintiff returned from his first trip to Israel, Mr. Jackson informed Plaintiff that Mr. Pruitt intended to fire or relocate to Plaintiff to somewhere Mr. Pruitt would never have to see him again and planned to give Plaintiff's salary and title to Ms. Hupp. Mr. Pruitt started the process to request Ms. Hupp's pay raise. Around February 2018, the White House denied the hefty pay raise.

43.     Mr. Pruitt also sought to give a pay raise to Sarah Greenwalt, another favored staff member, and the White House denied his request. In the face of the refusals, the two staffers resigned, only to be immediately rehired by Mr. Pruitt at salaries of $114,590 for Ms. Hupp (compared to $86,460 previously), and $164,200 for Ms. Greenwalt (compared to $107,435 earlier) by using funds approved to hire experts to enforce the Safe Drinking Water Act, in violation of 5 CFR §531.212. Plaintiff complained to the Assistant Director of Presidential Personnel, Jennifer Locetta, and Pruitt's action came under scrutiny. Plaintiff reported this to Charles Munoz and Jennifer Locetta in January 2018. He also told Nick Ayers, Corey Lewandowski, David Bossie and Bobby Peede.

44.     The Administrator used government funds to pay $3,000 for civilians to conduct a bug sweep of the EPA, a Federal building. It is a violation of law for a civilian to conduct a sweep of a Federal building. The bug sweeps started prior to Plaintiff's employment at the EPA, however upon his arrival at work it was one of the first things he learned about. In approximately June or July 2017, Plaintiff made external disclosures regarding this event to Nick Ayers, Jennifer Pavlik, Cory Lewandowski, David Bossie, Jennifer Locetta, and Bobby Peede. He also raised concerns internally with Kevin Minoli, Justina Fugh, Nino Perrotta, Ryan Jackson, Scott Pruitt, Patrick Sullivan, John Martin, Steve Williams, Jonathan Reeder, Charles Munoz, and Reggie Allen.

45.     The Administrator installed a $43,000 secure communications facility ("phone booth") next to his office, despite the already existing secure communications facility on another floor of the EPA building.  Other wasteful purchases include a standing desk, leased art on loan from the Smithsonian Institution, an 8 x 10 United States flag, art frames, framed pictures, and framed pens. The Administrator attempted to purchase a $15,000 desk and Nino Perrotta attempted to purchase the Administrator a $70,000 bullet proof desk (ultimately these purchases were not made). Plaintiff's disclosures about wasteful spending were made to Millan Hupp, Ryan Jackson, John Reeder, Reggie Allen, Nino Perrotta, Kevin Minoli, Justina Fugh, Arthur Elkins, Patrick Sullivan, Nick Ayers, Jennifer Pavlik, Cory Lewandowski, David Bossie, Jennifer Locetta, Charles Munoz, Bobby Peede, Rusty Roddy, Scott Hommel, John Kelly, John Martin, and Steve Williams.

46.     In violation of 5 CFR § 410.502 the Administrator paid security detail overtime, using their services on Saturdays and Sundays so they could acquire expensive

face cream for him, to be purchased at the Ritz-Carlton in Baltimore, Maryland. The

Administrator also used this security detail to pick up his dry cleaning and run other

errands.  Plaintiff made disclosures to EPA staff about the issues with security detail

expenses right away, approximately in April 2017. He told the EPA IG and Department

of Interior staffers around July/August 2017. He then spoke to the Vice President and

President's contacts around December 2017 or January 2018. His disclosures were made

to Nick Ayers, Jennifer Pavlik, Cory Lewandowski, David Bossie, Jennifer Locetta,

Charles Munoz, Bobby Peede, Jonathan Reeder, Reginald Allen, John Martin, Patrick

Sullivan, Arthur Elkins, and Rusty Roddy.

      47.     The Administrator rented a condominium from the head of Williams &

Jensen lobbying firm, which had business before the EPA.  Mr. Pruitt's daughter lived

there during her tenure as a White House intern. One of the firm's clients in 2017 was

Cheniere Energy Inc., which owned an active liquefied natural gas ("LNG") export

plan at the time, a matter of regulatory concern to the EPA. On information and belief,

Mr. Pruitt did not pay for the use of the condominium. Accepting such gifts is a

violation of 5 U.S.C. § 7353. Plaintiff made disclosures around June and July of 2017

concerning this matter to Nick Ayers, Jennifer Pavlik, Cory Lewandowski, David

Bossie, Jennifer Locetta, Charles Munoz, Bobby Peede, Reinhold Richard "Reince"

Priebus, Jonathan Reeder, Reggie Allen, Kevin Minoli, Justina Fugh as well as to Vice

President Mike Pence.

      48.     Plaintiff was present in meetings with Ryan Jackson and Millan Hupp

from about May 2017 to February 2018 when they verbalized that they were removing

from the "secret calendar" meetings the Administrator had with coal, mining, oil

industry, fertilizer businessmen/lobbyists (mostly from Oklahoma) and changed

calendar entries to "staff meeting" for the public calendar record.  EPA staff were directed to falsify the Administrator's official schedules after the meetings took place so the public and the EPA would not know of meetings with lobbyists.  Intentional deletion of meetings is a violation of the Federal Records Act, requiring agencies to maintain and preserve public documents. It is also a violation of 18 U.S.C. § 2071, which prohibits willful concealment, removal, mutilation, obliteration, or destruction of Federal records, or attempts to do these things. Plaintiff's disclosures about the "secret calendar" were made around December 2017 and January 2018 to Nick Ayers, Jennifer Pavlik, Cory Lewandowski, David Bossie, Jennifer Locetta, Charles Munoz, Bobby Peede, Jonathan Reeder, and Reggie Allen.

### C. <u>Plaintiff's Post-Exclusion Protected Activity</u>:

49.     Following initial whistleblower communications with the House Oversight and Government Reform Committee,, a meeting appointment was made for Plaintiff with committee staff for April 12, 2018. Following that committee staff meeting on said date, Senators Carper and Whitehouse, and Representatives Cummings, Connolly, and Beyer sent a letter to Administrator Pruitt setting forth Mr. Chmielewski's protected activity using his name more than twenty times. The same congressional officials sent an additional letter to President Trump using Mr. Chmielewski's name approximately ten additional times.

50.     Following his exclusion from the EPA workplace on February 12, 2018, Plaintiff engaged in protected disclosure to the news media explaining many of the foregoing disclosures and alleged that Administrator Pruitt had lied to Congress regarding them. These media disclosures included but were not limited to the following:

(a)     CNN, April 6, 2018, "EPA officials sidelined or demoted after raising concerns about Pruitt."

(b)     CNN, April 10, 2018, "Former Pruitt aide to talk to Congressional investigators this week."

(c)     NBC News, April 12, 2018, "Fired Whistleblower Details Corruption at EPA";

(d)     ABC News, April 30, 2018, "EPA Whistleblower Says Pruitt 'Lied' to Congress";

(e)     Fox News, April 27, 2018, "Megyn Kelly Interview with Kevin Chmielewski" (never aired).

(f)     New York Times, May 11, 2018, "Pruitt's Dinner with Cardinal Accused of Abuse Was Kept Off Public Schedule."

(g)     CNN, July 3, 2018, "Whistleblower: EPA's Pruitt Kept Secret Calendar to Hide Meetings"; and

(h)     The Hill, July 8, 2018, "Ex-aide Says He'll Take Credit for Pruitt's Downfall".

**D. <u>List of Statutes, Rules and Regulations Violated</u>:**

51.     Plaintiff reasonably believed that the foregoing information he disclosed regarding improprieties concerning the expenditure of public funds on travel, a phone booth, office furniture and redecoration, use of public servants to perform non-governmental functions, falsification of calendars and documents, receipt of things of value from a lobbyist with business before the Administrator, and use of personal email accounts to conduct government business violated one or more of the following statutes, rules, regulations and policies applicable to the EPA:

(a)     Under 5 U.S.C. § 5733, official travel on the part of Federal employees must be "by the most expeditious means of transportation practicable" and "commensurate with the nature and purpose of the [employee's] duties," not personal use.

(b)     The Federal Travel Regulation (FTR), issued by the U.S. General Services Administration (GSA), is codified in 41 CFR Chapters 300 through 304. The FTR implements statutory requirements and executive

branch policies for travel by Federal civilian employees and others authorized to travel at the government's expense. The GSA promulgates the FTR to interpret statutory and other policy requirements in a manner that balances the need to assure that official travel is conducted in a responsible manner with the need to minimize administrative costs, and communicate the resulting policies in a clear manner to Federal agencies and employees.

(c)      The EPA's travel policy—Resource Management Directive System (RMDS) 2550B, *Official Travel*, applies to EPA and other Federal employees who travel using agency funds. The policy also addresses travel that non-Federal sources pay for (i.e. "fund ") for EPA employees. The policy states that the FTR is the first source of reference for all Federal travel. RMDS 2550B, Section IV, *Responsibilities* requires justification and approval to use an indirect air route to prevent travel abuse by public employees making non-business excursions during government travel.

(d)      Under 5 U.S.C. § 7353, use of military aircraft is strictly regulated to prevent government officials from using them when commercial air travel alternatives are reasonably available.

(e)      Under FTR §301-11.30(a), a government traveler may be reimbursed for actual lodging expenses not to exceed 300 percent of per diem. EPA policy requires approval and justification in advance of trips if the expenses exceed 150% of per diem.

(f)      Section 710 of the Financial Services and General Government Appropriations Act, 2017 (section 710) prohibits an agency from obligating an amount in excess of $5,000 to furnish, redecorate, purchase furniture for, or make improvements for the office of a presidential appointee during the period of appointment without prior notification to the appropriations committees of Congress. The statutory language of section 710 requires notification not only for the purchase of furniture and for aesthetic changes, but also for supplying the office with other equipment. The Government Accountability Office found in its April 16, 2018 report that: "The U.S. Environmental Protection Agency (EPA) violated section 710 when it failed to notify the appropriations committees prior to obligating in excess of $5,000 for the installation of a soundproof privacy booth for the office of the Administrator during the period of his appointment. Because EPA used its appropriations in a manner specifically prohibited by law, EPA violated the Anti-deficiency Act and should report a violation as required by 31 U.S.C. § 1351."

(g)      Intentional deletion of meetings is a violation of the Federal Records Act, 44 U.S.C. § 3106, requiring agencies to maintain and preserve public documents. It is also a violation of 18 U.S.C. § 2071, which prohibits intentional distortion of Federal records.

19

## VI.  ADVERSE ACTIONS

A. <u>Adverse Actions by EPA</u>:

52.     On February 12, 2018, Plaintiff was locked out of his office and informed by EPA's White House Liaison Charles Munoz that the Administrator wanted him to resign effective immediately. Munoz said Plaintiff had leaked information on Mr. Pruitt's misconduct to the media, and/or that he was otherwise a source of such leaks. Plaintiff denied the incorrected allegation that he was a leaker and did not address the correct allegation that he was a source for some of the Washington Post coverage of the misconduct.

53.     Munoz then asked Plaintiff to sign a resignation form. Plaintiff refused. Munoz threatened him that if he did not resign, he would be "fired", lose his clearance and never get another job in the Federal government. Plaintiff was confident Munoz lacked removal authority and doubted the OPP would support a removal action by Pruitt on the basis that Plaintiff was an actual or perceived whistleblower.

54.     Plaintiff emphatically stated to Mr. Munoz that he refused to resign and was then escorted out of the EPA building by two armed security officers. At no time did Plaintiff orally or in writing resign from Federal service, or inform anyone that he resigned, or execute paperwork indicating that he resigned. Also, at no time has the government created paperwork stating that Plaintiff was involuntarily removed from the Federal service, either for cause, by resignation or otherwise. Consequently, Plaintiff still holds his Federal employee status.

55.     Following the events of February 12, 2018, Plaintiff immediately drove to the White House and told Jennifer Locetta and her assistant what had happened at the

EPA building. They told him words to the effect of "don't worry, Kevin. Give us a day or

two to straighten this out." Plaintiff left that discussion with the belief that "heads would

roll" at the EPA for the misconduct he had disclosed and whistleblower retaliation.

56.    Despite Plaintiff's refusals to resign, officials from the EPA and other

offices pressured Plaintiff as late April 17, 2018, to submit resignation papers, but he

adamantly declined to do so. Plaintiff believed that he was still officially an EPA

employee awaiting a new assignment from the OPP.  This continuing employment belief

was confirmed by the facts that (a) Munoz had given Plaintiff the February 12th

ultimatum to resign or be fired, yet in the two months since he had received no removal

notice; (b) he had been assigned to the Vice President's travel group and to the Air Force

Two Cape Canaveral trip; (c) he was still receiving compensation; (d) media reports

stated the sources informed them he was on "administrative leave"; and (e) the term

"resignation" in Federal service meant that at the time of giving one the employee is by

definition still the holder of a job to voluntarily surrender.

57.    On or about April 20, 2018, Plaintiff received personnel documents in the

mail falsely representing that he resigned on March 17, 2018. Plaintiff subsequently

learned that Charles Munoz had signed fraudulent documents "*for Kevin Chmielewski*"

and dated his purported resignation as March 17, 2018. Munoz also signed the

"Employee Mobile Device Acknowledgement Form" as "*For Kevin C.*" on March 17,

2018.  Ryan Jackson signed follow-up documents to the same effect "*for Scott Pruitt*" on

April 5, 2018. Plaintiff has no information as to why these officials selected March 17,

2018, for the fabricated and fictitious backdating.

58.     On March 31, 2021, the EPA OIG issued a report concerning Plaintiff and

others with said names redacted finding in part:

> Mr. Jackson and Mr. Munoz, who acted at the direction of Mr. Jackson,
> made and used official timesheets and personnel forms that contained
> materially false, fictitious, and fraudulent statements and representations to
> mislead EPA personnel and to facilitate continued payments to [payees
> redacted].

59.     In Congress' April 12, 2018 letter to the President, Plaintiff's employment

status was reported as follows:

> Mr. Chmielewski was *until recently* the Deputy Chief of Staff for
> Operations at the Environmental Protection Agency (EPA). While Mr.
> Chmielewski described himself as a lifelong Republican and a strong
> supporter of yours and the Vice President, he painted an extremely troubling
> picture of wasteful spending, unethical behavior, and improper retaliation
> against EPA staff on the part of EPA Administrator Scott Pruitt.

(Emphasis added).

60.     In Congress' April 12, 2018 letter to the Administrator, Plaintiff's

employment status was reported as follows:

> As Mr. Chmielewski learned more about your wasteful spending,
> irresponsible travel and inappropriate security efforts, he reported that he
> also learned that "every time you tried to find out about something you got
> in trouble." He said that when he refused to approve your inappropriate and
> unethical spending, he claimed he was marginalized, removed from his
> senior position and *placed on administrative leave*. ***
> ***
> He told our staffs that following his refusal, Chief of Staff Ryan Jackson
> called Mr. Chmielewski into his office and informed him that *you wished to
> fire or reassign him*. In addition, Mr. Chmielewski explained that EPA's
> White House Liaison, Charles Munoz, also informed him in February 2018
> that *you wanted him to resign* when he returned from a trip to Japan to staff
> Vice-President Pence.
> ***
> Mr. Chmielewski has been *on administrative leave* since that time, although
> he said he *recently read news reports that his employment may have been
> terminated*.

(Emphasis added).

B. **Adverse Actions by DOE**:

61.    On April 8, 2020 John McEntee and Jared Smith called Plaintiff from the White House and informed him that every time they tried to pass his paperwork through, it was stopped by numerous people because of what happened at the EPA with Scott Pruitt due to Plaintiff's disclosures.

62.    Plaintiff then texted Mr. Smith and asked if he or Mr. McEntee could speak when they were away from the White House and could talk freely. Mr. Smith sent Plaintiff a texted response that "the Admin[istration] isn't a possibility but I'll try and help you and will call you this weekend."

63.    Plaintiff received no more communications from the DOE and was not hired for the position he was told he would receive.

64.  Plaintiff reasonably believed in the truth of all his allegations above, which he repeated to Congress, the EPA Office of Inspector General, the U.S. Office of Special Counsel, the Merit System Protection Board, and the news media. The reasonableness of Plaintiff's concerns is demonstrated by the fact that Mr. Pruitt was forced to resign because of those very concerns.

## VII.   CAUSES OF ACTION UNDER THE FIRST AND FIFTH AMENDMENTS OF THE U.S. CONSTITUTION

65.    The First Amendment protects three governmental channels to report financial and other corruption by government officials: (A) Internal channels within the agency itself with the purpose of remediating the corruption without recourse to other channels; (B) external channels outside the agency but within the government such as an OIG, other agencies or departments, or the White House; and (C) public channels such as the media.  In retaliating against Plaintiff for use of these First Amendment protected

channels, EPA and DOE officials intended to obstruct the flow of information about corruption needed by Congress, the EPA-OIG, and an informed citizenry in exercising its direct popular vote for representatives under Article I, section 2, for senators under the Seventeenth Amendment, and for electors to select the President under Article II section 1.  Preventing and redressing government corruption is the cornerstone objective of the First Amendment.

66.     Plaintiff's disclosures were intended to and did aid the EPA-OIG in ferreting out agency corruption. The EPA-OIG was created pursuant to the Inspector General Act of 1978, as amended.  Although the EPA-OIG is a part of the EPA administratively, Congress provides it with its funding separate from the agency to ensure its independence from political influence, which would hamper anti-corruption investigations and enforcement against corrupt officials.

67.     Plaintiff's disclosures to Congress were intended to and did aid Congress in ferreting out agency corruption.  Congress is constitutionally charged with oversight of executive agencies and departments to ensure that the powers and budgets conferred by Congress are administered without the taint of corruption. Congress made clear in its April 12, 2018 letter to the Administrator that Plaintiff's disclosures were being pursued by Congress in furtherance of these oversight responsibilities:

> Mr. Chmielewski informed us that emails, documents and other records exist that will verify these events. Consequently, we request that you provide us with copies of all documents, including emails, meeting minutes, memos, correspondence, and other materials related to all of the matters raised in this letter to the extent such documents exist. For the reasons set forth above, we request that you provide the following documents for the time period of January 20, 2017 to the present date:
>
> 1. All documents and communications referring or relating to the purchase or potential purchase of security items to support the Administrator's security,

24

including but not limited to bulletproof vests, weapons, biometric locks or similar locking devices, bulletproof vehicles, and SUVs;

2. All documents and communications referring or relating to the hiring or potential hiring of Sequoia Security Group, anyone associated with Sequoia Security Group, or any other non-federal entity providing security for the Administrator;

3. All documents and communications referring or relating to the hiring of security contractors or foreign nationals to support Administrator Pruitt's trip to Italy;

4. All documents and communications referring or relating to the costs of decorating and/or otherwise furnishing Administrator Pruitt's office, including but not limited to the refinishing costs of the Administrator's desk, the purchase of a standing desk, the leasing and/or costs of borrowing art from the Smithsonian Institution or any other party, the framing of a United States flag, and the purchase of a coffee maker for the use of Administrator Pruitt;

5. All documents and communications referring or relating to the construction and financing of a secure, classified or soundproof space in Administrator Pruitt's office;

6. All documents· and communications referring or relating to the use of lights and sirens by Administrator Pruitt's security detail;

7. All documents and communications referring or relating to Millan Hupp' s assistance with the Administrator's rental or purchase of real estate, including but not limited to contacts with any rental or seller's· agents, travel to and from rental properties, and documents showing the time spent on this project;

8. All documents and communications referring or relating to any absence from work by Samantha Dravis;

9. All documents and communications referring or relating to any potential contracts or signed contracts to rent and/or lease a private jet for Administrator Pruitt's use or the use of any other EPA employee;

10. A complete and unredacted copy of Administrator Pruitt's calendar for his June 2017 trip to Rome as well as all documents and communications referring or relating to Administrator Pruitt's June 2017 trip to Italy;

11. All documents and communications referring or relating to Samantha Dravis' s travel to and/or from Morocco in December 2017, including the justification for her first class and/or business class travel;

12. All documents and communications referring or relating to employee travel to Oklahoma, including the travel of Administrator Pruitt;

13. All documents and communications referring or relating to Nino Perrotta's authority to justify his own first-class or business class travel;

14. All documents and communications referring or relating to Administrator Pruitt exceeding per diem limits, including documents and communications referring or relating to members of Administrator Pruitt's security detail not being reimbursed because of the expenses incurred by Administrator Pruitt;

15. All documents and communications referring or relating to the decision to fire, place on administrative leave, or reassign Kevin Chmielewski or Reginald Allen, including but not limited to any documents or communications regarding removing Mr. Chmielewski's credentials, parking pass, computer, secure phone, or other equipment;

16. All documents and communications referring or relating to the current employment status of Kevin Chmielewski;

17. All documents and communications referring or relating to the decision to promote and/or increase the pay of Millan Hupp and Sarah Greenwalt;

18. All documents and communications referring or relating to the Administrator's lease, rental, or purchase of property in the Washington, DC metropolitan area, including but not limited to ethics opinions or advice, evidence of payment or lack of payment, and complaints made of the Administrator or his family and associates; and

19. All documents and communications referring or relating to the Administrator, his staff, and his security team's use of hotel rooms on domestic and international travel, including the costs and the security of those rooms.

68.     Plaintiff's disclosure to the media were intended to and did aid Congress in ferreting out agency corruption. The First Amendment's prohibitions on "abridging the freedom of speech, or of the press" is the authority upon which the media can without governmental interference or retaliation expose corruption disclosed by whistleblowers and transmit those disclosures to Congress.

## COUNT ONE:  VIOLATION OF FIRST AMENDMENT
## FREE SPEECH RIGHTS

69.     The foregoing paragraphs are incorporated and reasserted as if fully set forth herein.  In early January 2018, Corey Lewandowski told Plaintiff that the Administrator knew about his disclosures.

70.     When Plaintiff refused to violate laws and Federal rules and made disclosures to officials outside of the EPA, the Administrator sought to reassign Plaintiff's SES Deputy Chief of Staff responsibilities to Ms. Hupp, a GS-11 employee.

71.     In January 2018, when Plaintiff returned from agency travel to Israel, Jackson and Munoz informed him that the Administrator intended to fire or reassign him to avoid any further face-to-face contact with Plaintiff.  Jackson and Munoz told Plaintiff to cease his oversight of the Administrator and that they would try to reassign him elsewhere.

72.     Oversight of the Administrator's compliance with non-travel expenses, budgetary, use of personnel, conflict of interest and email policies, rules and regulations was not a duty assigned to Plaintiff, and was not a part of his job description.

73.     Plaintiff's disclosures of the Administrator's non-compliance with expense, budgetary, personnel use, record keeping, conflict of interest and email policies, rules, and regulations neither impeded Plaintiff's proper performance of his duties, nor interfered with the regular operations of the Administrator's office or the performance of the Administrator's duties.  Far from disrupting the agency, plaintiff's disclosures restored the lawful, responsible operations and management of the EPA.

74.     Plaintiff did not agree explicitly or implicitly to waive, surrender, or refrain from exercising his First Amendment rights by reason of accepting employment at

the EPA. In accepting his positions, he intended to fully retain his rights to speak as a citizen addressing matters of public concern.

75.    All of Plaintiff's disclosures set forth above addressed matters of public concern.  This is supported by the fact that the misconduct made sustained, intense media spotlight that forced Mr. Pruitt's resignation finally ending his reign of corruption. Furthermore, plaintiff's disclosures spurred multiple Federal investigations and intense Congressional oversight.

76.    The Administrator and his senior staff including Ryan Jackson, Chief of Staff to EPA Administrator, Charles Munoz, White House Liaison for EPA, and Pasquale Perrotta, Chief of Security for the Administrator, and the White House Office of Management and Budget had knowledge of Plaintiff's disclosures as set forth above.

77.    Because of Plaintiff's disclosures, the Administrator threatened him with termination, cancelled his building and computer access authorizations, reassigned him, placed him on paid administrative leave and then on unpaid administrative leave, coerced him to resign, and blocked him or otherwise involuntarily removed him from performing gainful employment with the United States.

78.    The Administrator, the EPA and the United States had no legitimate governmental interest in taking the listed adverse actions against the Plaintiff.

79.    Plaintiff was qualified for the DOE position for which he was interviewed and told to shortly expect an appointment thereto.

80.    DOE officials were aware of Plaintiff's protected activity, including through extensive media coverage of the same.

81.     Plaintiff was not hired into the DOE position in retaliation for his protected activity in violation of his speech rights under the First Amendment.

## COUNT TWO:  VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT

82.  The foregoing paragraphs are incorporated and reasserted as if fully set forth herein.

83.     The Office of Personnel Management regulations confer upon SES noncareer appointees a right to notice prior to removal.  5 CFR § 359.902 "Conditions of Removal" render the agency's right to remove an appointee contingent upon notice prior to the date of removal. This regulation established Plaintiff's expectation of pre-removal notice.

84.     Instead of providing Plaintiff with the required prior notice, the Administrator, Munoz, Jackson, and other EPA officials affirmatively concealed Plaintiff's employment status by creating false, fraudulent and fictious documentation of a resignation he had not submitted.

## VIII.  REQUEST FOR RELIEF

WHEREFORE Plaintiff requests that this Court:

A.      Enter a Declaratory Order that Plaintiff was never lawfully removed from his Federal position, and that he never resigned from said position, and, therefore, continues to lawfully retain his status as an EPA employee;

B.      Additionally or alternatively, reinstate Plaintiff to his employment as Deputy Chief of Staff of the EPA, retroactive to February 12, 2018 or to a comparable position in the SES and/or as a GS14;

C.      Alternatively, instate Plaintiff to the GS-15 non-career position he was to receive at the DOE;

D.      Order expunged from Plaintiff's personnel file all records related to any alleged removal from Federal service, and the correction of any other false records;

E.      Enjoin Defendants from further retaliation against the Plaintiff;

F.      Award Plaintiff his costs and reasonable attorneys' fees incurred in this action under the Equal Access to Justice Act, 28 USCS § 2412; and

G.      Award all other relief not herein requested but available to Plaintiff under the laws of the United States and equity based upon the facts herein pleaded.

                                          Respectfully Submitted,

                                          ____/s/ Thad M. Guyer_____
                                          Thad Guyer (Oregon Bar 821443
                                          *pro hac vice*)

                                          John A. Kolar, (D.C. Bar 292953)
                                          jackk@whistleblower.org

                                          Samantha P. Feinstein (D.C Bar 1655505)
                                          samanthaf@whistleblower.org

                                          Government Accountability Project
                                          1612 K. Street NW, Suite 1100
                                          Washington, D.C. 20006
                                          Telephone: (202) 457-0034

                                          Attorneys for Plaintiff